**JOHN F. FLEMING, INCORPORATED,**
Plaintiff-Appellant,

v.

Clarence A. **BEUTEL** and American National Bank and Trust Co. of Chicago, Defendants-Appellees.

No. 16233.

United States Court of Appeals
Seventh Circuit.

May 16, 1968.

Sheldon Karon, Howard Koven, Joseph A. Spitalli, Chicago, Ill., Friedman, Koven, Salzman, Koenigsberg, Specks & Homer, Chicago, Ill., of counsel, for appellant.

Don H. Reuben, Lawrence Gunnels, John E. Angle, Mitchell Edelson, Sr., Chicago, Ill., Kirkland, Ellis, Hodson, Chaffetz & Masters, Chicago, Ill., of counsel, for appellees.

Before HASTINGS, Chief Judge, FAIRCHILD and CUMMINGS, Circuit Judges.

FAIRCHILD, Circuit Judge.

Action [1] to recover a broker's commission for procuring a buyer for a very valuable collection of rare books.

John F. Fleming is a widely known expert and dealer in rare books. His corporation is plaintiff. Louis Silver was owner of the books in question, of-

ten referred to as the Silver library. Mr. Silver died October 27, 1963. Defendants Beutel and American National Bank and Trust Company of Chicago are his executors. Interested beneficiaries of his estate were his widow and daughters.

Plaintiff's complaint alleged, in essence, that before Mr. Silver's death he employed plaintiff to sell the library; that after his death plaintiff's employment was continued by defendants; that prior to May 13, 1964, plaintiff's efforts produced the University of Texas as a ready, willing, and able buyer at a price ($2,750,000) and upon terms agreeable to defendants, but that defendants on that date sold the library to the Newberry Library of Chicago (not procured by plaintiff); that the reasonable, usual, and customary rate of commission for services of the type rendered by plaintiff ranges between 15% and 20%.

Defendants filed no answer, but moved for summary judgment. The material in support of and in opposition to the motion was voluminous, consisting of affidavits, depositions, and correspondence, memoranda and other documents appended as exhibits.

The district judge filed a memorandum, analyzing the material on file and determining (1) that no agency or brokerage agreement was ever consummated between the parties and (2) that, in any event, the University of Texas was not, prior to the sale to Newberry Library, a ready, willing, and able buyer.

Judgment was entered for defendants and plaintiff appealed.

*Undisputed facts.*

Fleming and Silver were friends and often dealt with each other. On June 25, 1963, Mr. Silver authorized Fleming and his corporation to offer the Silver library for sale at a price established by an appraisal made by Fleming. (It is unnecessary under the circumstances to distinguish between Fleming individually and his corporation, and we shall re-

1. Jurisdiction is founded on diversity. Illinois law governs.

fer to "Fleming" as if they were identical.)

After Mr. Silver's death in October, Fleming continued to seek a buyer. He did so with the consent of the executors and Mrs. Silver. There was no express contract for his services or commission as broker.

Fleming introduced the University of Texas as a prospective buyer in November, 1963. In December the Board of Regents authorized Dr. Ransom, the Chancellor, to buy the library at a price of $2,750,000, and this price was acceptable to the estate. The Texas Board of Control approved. Fleming had aided Dr. Ransom in preparing his presentation to these boards. In March, April, and early May, 1964, attorneys for the estate and the university worked on successive drafts of a purchase contract.

After Mr. Silver's death, the books had been moved to the vaults of defendant American National Bank. No representatives of the university had inspected the books, although they had examined a detailed inventory of them. In early May the parties contemplated that an inspection by representatives of the university would precede the signing of the purchase contract. The contract would be performed on the date it was signed. There is evidence that the university representatives would have come to inspect on May 11, 12, or 13, but were told by defendants not to come.

Starting in December, 1963, Fleming and the defendants had negotiated and argued about the amount of Fleming's commission in the event of sale to the university. No agreement was reached, Fleming's minimum, except for one conversation, being $200,000, and defendants' maximum being 5%, or $137,500,

plus certain books not included in the sale.

Newberry Library approached defendants as a possible buyer April 21, and the contract of sale to Newberry was signed May 13, 1964. Newberry paid $2,687,500. No commission was paid. Defendants assert that the sale price was computed by subtracting from $2,750,000 the amount of a 5% commission and adding $75,000 in contemplation of litigation by Fleming, with an informal understanding that Mrs. Silver would make a gift to Newberry of some part of the $75,000 if not required for Fleming.

*Did the defendants establish that as a matter of law defendants had no contract to pay Fleming for procuring a buyer?*

"No particular form of words is necessary to engage the services of a real estate broker, Purgett v. Weinrank, 1920, 219 Ill.App. 28, 30, although a mere statement to a broker of the price at which the owner will sell is not of itself sufficient to imply a 'contract of employment.' * * * What is necessary is that the broker act with the consent of the principal, whether such consent be given by written instrument, orally, or by implication from the conduct of the parties." [2]

Where a broker is engaged and no amount or rate of commission is agreed on, there is an implied agreement, under Illinois law, to pay the usual and customary commission for similar transactions.[3]

We deem it unnecessary to relate all the evidentiary material relevant to this issue. Suffice it to say that the record shows ample support for a find-

**2.** Greenwald v. Marcus (1st Dist.1954), 3 Ill.App.2d 495, 123 N.E.2d 139. Accord: Doss v. Kirk (1st Dist.1956), 8 Ill.App.2d 536, 132 N.E.2d 49, 50; Chiagouris v. Continental Trailways (1st Dist.1964), 50 Ill.App.2d 196, 200 N.E.2d 399, 400.

**3.** Commercial Products Corporation v. Solem Machine Company (2d Dist.1961),

29 Ill.App.2d 73, 172 N.E.2d 521; Hackett v. Farkas (1st Dist.1958), 19 Ill.App. 2d 309, 152 N.E.2d 475; Dever v. Dunlap (4th Dist.1952), 347 Ill.App. 79, 106 N.E.2d 141; Kappes v. Bacon (1st Dist. 1917), 209 Ill.App. 290; Woolf v. Hamburger (1st Dist.1916), 201 Ill.App. 612; Parmly v. Farrar (1st Dist.1903), 105 Ill.App. 394, aff'd 204 Ill. 38, 68 N.E. 438.

ing that the estate agreed (by implication) to pay Fleming the usual and customary commission if he procured a ready, willing, and able purchaser at a price and upon terms acceptable to the estate. Although the defendants seem to argue that by the phrasing of certain statements in the negotiations for the amount of commission Fleming agreed to forego a commission if the sale to the university did not occur for any reason, we are unable to read the statements with that meaning.

*Did the defendants establish that as a matter of law University of Texas was not a ready, willing, and able buyer just before the sale to Newberry?*

 Under the law of Illinois, a broker earns his commission when he produces a purchaser ready, willing, and able to buy on terms acceptable to the seller. Once he has done so, the commission is earned even though no enforceable contract to purchase is ever formed and no sale is consummated, if, in fact, the failure to contract or consummate is wholly attributable to the seller.[4]

 The record indicates that throughout negotiations between the defendants and the university, $2,750,000 was an acceptable price. In December, 1963, the university contemplated payment in two instalments, but during later negotiations indicated that the entire price would be paid in cash. The record suggests that the university's Texas counsel was concerned about problems involved in making a purchase of personal property of such great value from executors in a distant state and defendants' Chicago counsel about those involved in selling rare books to a sovereign state in return for almost three million dollars of public funds. The delay from mid-January to mid-May was

four months. At least some of it may reasonably be attributed to the efforts of each counsel to work out a procedure and an appropriate contract which would fully protect his client. Defendants suggest that the delay was chargeable to the university and relieved them from treating it as a willing buyer, but this claim can not be said to have been established as a matter of law.

There is evidentiary material in the record indicating that the university was ready, willing, and able to purchase for the agreed price, in cash, in May, and had made this known to defendants. On March 27, the university retained a Chicago firm as counsel. Mr. Fieldman, of that firm, participated in the negotiations. He stated in an affidavit that final agreement on the revised contract was reached no later than May 8. A State of Texas purchase voucher, to be executed by defendants and presented for payment, had been prepared and Mr. Fieldman sent it to defendants' counsel May 12. On that date Mr. Fieldman telephoned Brinks' Inc. to arrange transportation of the books from the bank to the airport.

Dr. Harry Ransom, Chancellor of the University of Texas, testified by deposition. He stated that the full purchase price was available in a special account from February 11, 1964 to June 1, when it was used for other library purchases. University counsel had supplied an opinion January 27, that the board of control could delegate to the university the authority to purchase a library and pay for it out of the intended fund. This opinion had been approved by an assistant attorney general. Dr. Ransom's testimony indicates no doubt that it was his intention to proceed with the purchase.

Although the university had not sent anyone to examine the books, Mr. Sil-

4. Chiagouris v. Continental Trailways (1st Dist.1964), 50 Ill.App.2d 196, 200 N.E.2d 399, 404; Greenwald v. Marcus (1st Dist. 1954), 3 Ill.App.2d 495, 123 N.E.2d 139, 141; Goldstein v. Rosenberg (1st Dist. 1947), 331 Ill.App. 374, 73 N.E.2d 171, 172; Fallen v. Rauguth (1st Dist.1929), 253 Ill.App. 328, 330; Murawska v. Baeger (1st Dist.1920), 219 Ill.App. 241, 246; Bryant v. Palmer (3rd Dist.1912), 171 Ill.App. 213, 216; Scott v. Stuart (2d Dist. 1904), 115 Ill.App. 535, 539.

ver's library had a considerable reputation in the rare book world and Dr. Ransom is an expert in this field. He explained that in November or December Fleming had supplied an analytical bibliographical description of the Silver library, prepared by Mrs. Silver with the assistance of an expert at Harvard, containing a leaf by leaf analysis of the major books, and a check list. These had been submitted to Dr. Todd, the university's chief of bibliographical research. Dr. Todd had analyzed each volume, not only from the record supplied by Fleming, but also auction records concerning these books or similar books, so as to establish "the state of the individual volumes, their provenance wherever that was possible, prior owners, and their census or location of other similar copies. All of these things are easily accessible records in the auction history of a research collection. * * *"

On May 8, a formal authorization was issued for Dr. Todd and two others to travel to Chicago "to perform preliminary tasks in connection with moving a very valuable library to the University of Texas; making an inventory, packing, sealing and preparing for shipment." Although defendants claim that other facts would support an inference that the university's decision to buy was still subject to an evaluation of the library after Dr. Todd's inspection, we find much to indicate that the mission of Dr. Todd and his associates was no more than to verify that the books in the bank were the books which had been listed and to see to their preparation for shipment. There is evidence that Dr.

Ransom had told Mr. Edelson, defendants' Chicago counsel, and Mr. Stern, a vice president of defendant bank, that the inspection had this limited purpose.[5]

If all material terms of the sale had been agreed upon, as Mr. Fieldman stated, and if the inspection was for such limited purpose, the fact that the inspection would precede signing and closing does not establish that the university was not a ready, willing, and able buyer.[6]

Moreover, there is some indication that the Todd inspection would have taken place on May 11, 12, or 13th but for delay caused by defendants for the purpose of giving Newberry an opportunity to examine the books first.

Defendants did not inform the university of the real reason for the requested delay, but gave misleading information as an excuse. They kept Newberry informed of the state of dealings with the university, but not vice versa. It is suggested in the record that defendants preferred Newberry because it was a local institution. If the jury should find that the university was at this stage a ready, willing, and able purchaser, it would, so far as the present record indicates, necessarily follow that the failure to execute the contract and consummate the sale was wholly attributable to defendants.

The purchase contract was to be executed on behalf of the university by the chairman of the board of regents. Chairman Heath's affidavit was presented by defendants. He stated he would not have executed the contract

---

5. Defendants rely upon the fact that the final draft of the purchase contract included the following:

"Buyer represents and agrees

"(a) that Buyer has caused competent bibliographers and curators of the University of Texas to examine said Library, to research and otherwise familiarize Buyer with the bibliography of each of the items shown on said inventory list and with the provenance and condition of each of said items."

The fact that the university on May 8 was willing to sign a contract with that language does not conclusively establish that it would do more between May 8 and the signing of the contract than ascertain that the books being delivered were the books described to them. The research referred to had, according to Dr. Ransom, previously been done.

6. See Rainier v. Champion Container Company (3rd Cir. 1961), 294 F.2d 96, 101, dealing with a buyer's insistence on verifying a balance sheet.

without "a full and complete inspection", but did not say that the inspection would go beyond the purpose indicated by Dr. Ransom.[7]

■ Defendants were entitled to summary judgment only if the voluminous record showed "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[8]

■ As already stated, we think there are evidentiary facts to support a finding that defendants have obligated themselves to pay Fleming a commission if he procured a buyer. If he persuaded the jury of such obligation, did he perform, notwithstanding the fact the sale did not occur? We think there are evidentiary facts to support a finding that the university was, on the basis of the information it had, a ready, willing, and able buyer and that the failure to execute the contract or consummate the sale was wholly attributable to defendants. If that finding were made, it would ordinarily follow that Fleming had performed as called for by the contract and had earned his commission.

There is, however, one additional issue to be considered.

*Were defendants entitled to summary judgment because of Fleming's statement about "seriously imperfect" books?*

On December 20, 1963, Fleming wrote defendant Beutel with respect to possible arrangements in the event of an auction. He included the following paragraph:

"In my contract with the Estate for the sale of the Silver Library to the University of Texas I want it completely clear that I am not responsible for the fourteen books that are seri-

ously imperfect and are appraised in the Silver inventory at $237,000 (the University of Texas has not seen the books as yet—only an index list of the collection)."

Mr. Stern testified to a telephone conversation with Fleming about the same date, in part as follows:

"He told me that he had been in an argument with Bob Lifton [Silver's son-in-law] about commissions and he was now going to act like a hard businessman and that he was, as I recall, sending—had sent me a letter or was going to send me a letter with some various items in it.

"He also said something that really. was very shocking, for a person who was expected to be a fine businessman, that there was some seriously imperfect books in this collection and that he was the only one that could explain this to Texas, and this was in the context of course, of his saying that he was having those discussions with Mr. Lifton about commissions which were very unsatisfactory to him."

Mr. Fleming's deposition is in the record. He denied the implication of a threat in order to resolve the dispute about commissions.

He testified he had never told Dr. Ransom about the fourteen imperfect books, but had intended to be present when the books were examined and tell him then. He said:

"In the list of books that Dr. Ransom had of the Silver collection there was no indication of perfection, imperfection or anything pertaining to any individual book. It was absolutely necessary to inform them of any imperfection that existed in any one of those books before they took pos-

---

7. July 13, 1964 Mr. Heath wrote to the university's Chicago counsel, commending them for their services, and said: "As you know, the people ran out on us at the last minute after having reached a firm agreement with us and at the very moment the last 'i' was being dotted and

't' crossed." It is not certain that plaintiff's counsel will be able to get this letter into evidence upon a trial, but it is in the record before us.

8. Rule 56(c) F.R.Civ.P.

session of them. I have no doubt in my mind that the imperfections would not have stopped the sale of the books."

Mr. Fleming never described the imperfections, but listed 16 titles as imperfect books, and designated two more with a question mark.

Dr. Ransom testified that the bibliographical analysis disclosed imperfections in more than fourteen books. Many rare books (often centuries old) are not perfect. He was in doubt about what Fleming meant by "seriously imperfect". If the term meant, he said, "any major deviation from the description already given us—of course, it would not have been the library that we agreed to buy."

When asked to assume that upon Dr. Todd's inspection, Fleming had announced the presence of seriously imperfect books, Dr. Ransom said:

"If anybody knowledgeable of books had introduced a new announcement about imperfections which had not already been reported bibliographically and which were not accepted by the technical bibliographer who was representing the university, Dr. Todd, then, of course this would have been a serious matter.—From my knowledge now of these so-called imperfect books, I would have to say only that our acquisition of these books would have been an historic achievement for the University of Texas."

He noted, as an illustration, that one of the imperfect titles listed by Fleming was a Bible in English, translated by Miles Coverdale (1535). It had been bought by Mr. Silver for $13,000. Its estimated value in 1964 was $16,000. It was sold, apparently by Newberry, November 8, 1965, for $44,000.

Mr. Heath testified that if, before he signed the contract, someone had reported Fleming's opinion that fourteen to sixteen of the books were seriously imperfect, he would have declined to sign the contract until he had thoroughly in-

vestigated the matter. Presumably he would have relied on Dr. Ransom.

We find this question difficult. If Fleming had material information and, as sellers' agent, was under some duty to disclose it to the buyer before sale, he could not claim to have completed performance when he had not yet disclosed it. If, on the other hand, the disclosure would be a breach of his duty to his principals, and their anticipation that he would make the disclosure caused them to decide not to go forward with the sale, he would have no claim. If the information to be disclosed was not material, why did he say the disclosure was "absolutely necessary"?

Neither Fleming's testimony nor his counsel's brief yields satisfactory enlightenment.

■ We note, however, (1) that Fleming's testimony that Dr. Ransom had no particularized information is patently mistaken—perhaps he had forgotten that the information had already been made available; (2) that Fleming stated he had no doubt the imperfections he had in mind would not have stopped the sale, and (3) that nothing in the record other than Fleming's own phrase suggests that there were any material deficiencies of which the buyer was not aware; Dr. Ransom testified he had not learned from any source of flaws unknown to him in May, 1964.

The record is sufficiently equivocal, in our opinion, so that this element of the case does not establish as a matter of law that defendants were entitled to judgment.

We have already said the record is voluminous. We have not attempted to refer to every fact which might tend to support the cause of one party or the other. Because we are testing defendants' motion for summary judgment, we are not concerned with whether there are facts which might sustain a verdict for defendants, but only with whether defendants have demonstrated that a

verdict could not properly be rendered for plaintiff.

The judgment appealed from will be reversed and the cause remanded for further proceedings.