**Jay M. MILLER**

v.

**J. Douglass CORSON and Harry L. Hand, Ind. and t/a Corson & Hand, a Partnership.**

**Civ. A. No. 42354.**

United States District Court, E. D. Pennsylvania.

Jan. 7, 1971.

Richard J. Gordon, Dilworth, Paxson, Kalish, Kohn & Levy, Philadelphia, Pa., for plaintiff.

S. Gordon Elkins, Stradley, Ronon, Stevens & Young, Philadelphia, Pa., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER

HANNUM, District Judge.

Presently before this court is the claim of a business broker for his commission for services allegedly rendered in effecting a commitment for a net loan of $225,000.00. After hearing and due consideration in this matter, the court makes the following:

## FINDINGS OF FACT

1. Plaintiff, Jay M. Miller, is an individual with his principal place of business located in Philadelphia, Pennsylvania.

2. Plaintiff is a financial consultant who arranges business, commercial and real estate loans for prospective borrowers.

3. Defendants, J. Douglass Corson and Harry L. Hand, are individuals trading as Corson and Hand, a partnership, with their principal place of business located in Wildwood, New Jersey.

4. Defendants build, manage, rent and sell real property and the buildings erected thereon.

5. In early January 1967, defendant Corson advised Charles W. Gross, Esquire of his need to borrow several hundred thousand dollars. Mr. Gross suggested to Corson that plaintiff Miller might be able to obtain such financing.

6. Corson handled negotiations on such matters as financing for the partnership of Corson and Hand.

7. On January 19, 1967, Corson and Miller met in Wildwood, New Jersey where it was explained that Corson and Hand needed approximately $250,000.00 to $300,000.00 to pay off loans and real estate taxes.

8. No specific amount of interest was indicated as acceptable by Corson, or obtainable by Miller, except that Corson indicated his desire to keep the interest "as low as possible".

9. As security, Corson offered land owned by Corson and Hand in the Windsor Shopping Center, Hightstown, New Jersey.

10. No other security for the contemplated loan was discussed except the Hightstown property.

11. At that time, Miller asked for and received from Corson the financial statements of Corson and Hand and the corporations they owned, and also the personal financial statements of Mr. and Mrs. Corson and Mr. and Mrs. Hand.

12. Corson also gave Miller leases on various properties in the Windsor Shopping Center.

13. No leases or other back-up information was given by Corson to Miller with respect to any properties except the Windsor Shopping Center.

14. At the January 19, 1967 meeting in Wildwood, no agreement was reached as to the specifics of the loan which would be acceptable to Corson and Hand, either as to the specific amount, the rate, the terms of repayment, or the security for the loan, nor were the specific arrangements with respect to Miller's commission agreed upon although Corson agreed that a commission would be proper if an acceptable loan could be negotiated.

15. Thereafter, Miller contacted Mr. Kapnek of Greater Acceptance Corp., a

lending institution, to see if it would lend to Corson and Hand.

16. On January 25, 1967, Miller, Corson and Mr. Gross met for breakfast where Corson repeated his interest in obtaining a loan of $250,000.00 to $300,000.00. Miller stated that the interest might be higher than Corson was accustomed to paying, or in the neighborhood of one (1%) percent per month.

17. At the breakfast meeting, Miller told Corson that he wanted a commission of six (6%) percent, and Corson agreed that that would be satisfactory if an acceptable commitment for a loan could be obtained.

18. After the breakfast meeting, Corson and Miller went to the offices of Greater Acceptance Corp. and met with Mr. Kapnek, Sr. and Mr. Kapnek, Jr. Mr. Kapnek, Sr. there stated that Greater Acceptance Corp. would make a gross loan of $300,000.00 which would net $225,000.00 at the rate of 17% interest payable $4,000.00 per month for 24 months with a final "balloon" payment for the balance. There would be no pre-payment privilege for the first year and the security for the loan would be a second mortgage on three properties owned by Corand Corporation, plus a bond and warrant from Mr. and Mrs. Corson and Mr. and Mrs. Hand personally guaranteeing the loan.

19. These conditions of the loan, not only as to gross amount, but also as to terms of payment, security and interest rate, had never been previously discussed by Corson and Miller and emanated solely from Mr. Kapnek.

20. Corson told Mr. Kapnek that he would have to consider the proposal and discuss it with his partner. He also indicated that the interest rate was beyond Corson and Hand's ability to pay.

21. The meeting terminated with Corson agreeing to call Mr. Kapnek, Jr. that afternoon so that Mr. Kapnek could advise Corson whether Greater Acceptance Corp. could come up with something other than what had been discussed.

22. On the subway ride back to center city, Corson explained to Miller that Mr. Kapnek had brought in properties which he had never intended to use as security, and which were already fully encumbered.

23. Subsequent to discussing the proposal with his partner, on January 26, 1967 Corson spoke with Mr. Kapnek, Jr. who advised Corson that no new terms or conditions would be forthcoming from Greater Acceptance Corp. Corson therefore advised Mr. Kapnek that there would be no deal.

24. On January 26, 1967, Mr. Kapnek, Jr. mailed to Miller a commitment letter outlining the terms proposed at the meeting of January 25, 1967, and adding at least one additional term.

25. Miller forwarded a copy of this letter to Corson under a cover letter dated February 3, 1967.

26. The proposal made by Greater Acceptance Corp. for a loan to Corand Corporation was unacceptable to Corson and Hand.

27. The highest interest rate Corson and Hand ever paid for a loan, both as to loans made prior and subsequent to January 1967, was 7%.

28. Corson and Hand's average rate of return on investments is between 11% and 13%.

## DISCUSSION

This case turns on the finding of several key facts from contradictory testimony. Both parties agree that Miller would earn a commission by finding a lender for Corson and Hand. Miller's version is that he would earn the commission by simply producing a commitment letter *on any terms*. Corson contends that the agreement was that he would pay Miller a commission for finding a lender who would lend funds on terms which were *acceptable* to defendants. The basis for finding specific facts rests solely on the credibility of the witnesses. A brief review of the

testimony may therefore help to clarify the findings of the court.

■ No objective guidelines were established to define exactly what terms would be acceptable to Corson. However, an open-ended agreement whereby Miller would earn a commission by producing a commitment letter for a loan, regardless of the terms of the proposed loan, is highly unlikely. Surely defendant did not enter an agreement which bound him to pay a commission to plaintiff for finding a lender willing to lend funds only on terms which would be totally unacceptable to a borrower in the position of Corson and Hand. The reconstruction of events, as related by Miller, presents a picture which is difficult to believe, and the court therefore finds that the agreement, if any, was that Miller was to earn a commission by producing a lender willing and able to loan funds on terms which were satisfactory to the defendants.

■ Miller testified, however, that Corson did in fact agree to the loan as proposed at the meeting in the office of the lenders where the terms were originally discussed. Corson denies that he ever indicated his assent to borrow on the terms proposed. Again, the testimony of defendant is more believable. Plaintiff's testimony is to the effect that Corson agreed to pay interest at the rate of 17% although this was the first time this rate had been mentioned, although Corson did not consult with his partner before agreeing to this rate, and although the rate of interest was significantly higher than the rate of return on the investments of defendant. Similarly, to agree to the terms as proposed would mean that defendant agreed to put a mortgage on both his and his partner's private dwellings although this had never been previously discussed and he had not consulted with his partner on the matter. It is more likely, as defendant claims, that he stated that he would consult with his partner on the terms of the proposed loan, but after consultation, rejected the loan as proposed.

■ The case before us, then, is one where the parties agreed, if at all, that if a loan could be procured which was acceptable to the hopeful borrower, then the loan broker would have earned his commission. The court is therefore guided by the principles stated in Burke v. Daughters of Most Holy Redeemer, 344 Pa. 579, 26 A.2d 460 (1942). In that case, the court stated at page 581, 26 A.2d at page 461:

"* * * that under such a contract the test of adequate performance is not whether the person for whom the service was rendered *ought* to be satisfied, but whether he *is* satisfied, there being, however, this limitation, that any dissatisfaction on his part must be genuine and not prompted by caprice or bad faith."

The terms of the loan as proposed by the Kapneks were unacceptable to the defendants. Their dissatisfaction was not prompted by bad faith but by the stated reasons that they could not afford to pay interest at a rate far above that which was contemplated and discussed by the parties in preliminary negotiations, and the security demanded was never previously mentioned nor intended by defendants to be used for that purpose.

■ Plaintiff contends that the general rule applicable to this case is that where a broker finds a customer ready, willing and able to enter into a transaction on the terms proposed by the principal, he cannot be deprived of his right to a commission by reason of the transaction failing because of some fault of the principal. Colonial Mort. S. Co. v. Melrose C. C., 416 Pa. 340, 206 A.2d 10 (1965); Middleton v. Thompson, 163 Pa. 112, 29 A. 796 (1894); Freiwald v. Fidelity Interstate Cas. Co., 185 Pa.Super. 190, 138 A.2d 146 (1958); Mearkle & Bros. v. Kellerman, 82 Pa.Super. 11 (1923). These cases are inapposite under the facts as found. In each of these cases, there was a prior agreement between the borrower and the broker which set certain standards for the

terms of the loan sought. The broker earned his commission by finding a lender who was ready, willing and able to make the loan on terms which met the prescribed standards. In such a case, the commission has been earned even though the borrower refuses or is unable to go through with the transaction. In the present case, there were no previously agreed upon guidelines relating to what terms would fall within the realm of acceptability. The defendants had the option to reject any proposed loan arrangement so long as their rejection was in good faith and not capricious. The court has found no bad faith or default attributable to the defendants.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the subject matter by reason of 28 U.S.C.A. § 1332.

2. Since the plaintiff and defendants did not specify the terms of the contemplated loan prior to plaintiff's attempt to secure a lender, the agreement between plaintiff and defendants required plaintiff to produce a lender who would make a loan which defendants would find satisfactory and accept.

3. Under the agreement to procure a loan which defendants would find acceptable, the test of whether plaintiff adequately performed his obligation is not whether plaintiff produced an offer of a loan, the terms of which ought to satisfy defendants, but whether the terms did satisfy defendants.

4. Defendants were not satisfied with the proposed terms of the loan and their dissatisfaction was genuine and not predicated on caprice or bad faith.

5. Plaintiff did not perform his part of the agreement with defendants and is therefore not entitled to a commission from the defendants.

## ORDER

And now, this 7th day of January, 1971, judgment is hereby entered for the defendants.