Bernard **FEINBERG**

v.

**AUTOMOBILE BANKING CORPORATION.**

**Civ. A. No. 68–1083.**

United States District Court,
E. D. Pennsylvania.

Jan. 30, 1973.

See also, 304 F.Supp. 147.

Joseph N. Ewing, Jr., Philadelphia, Pa., for plaintiff.

Sidney Schulman, Philadelphia, Pa., for defendant.

## OPINION

BECHTLE, District Judge.

Plaintiff, Bernard Feinberg (hereinafter "Feinberg"), a resident of Chicago, Illinois, by this action, seeks to recover an amount allegedly due him under a purported contract between himself and the defendant, Automobile Banking Corporation (hereinafter "Borrower"). Borrower was, at the time of its transaction with Feinberg, a publicly held company engaged in the consumer finance business. Although a Delaware

corporation, Borrower was duly registered to do business in Pennsylvania, with its principal office located in Philadelphia. Jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a).

On or about March 8, 1967, Borrower, through its president, Mr. Theodore J. Seiver, contacted its Chicago, Illinois, broker, Ashwell and Company (hereinafter "Broker"), and asked its president, Mr. Donald G. Reid, to place with a suitable lender three $100,000 junior subordinated notes of Borrower, maturing in 13, 14 and 15 years, respectively, and bearing interest at a rate of six percent (6%). Broker informed Borrower that it was not in the business of placing long-term notes but that it had some connection with people who were. Broker suggested to Borrower that it could try to contact someone operating in the area of long-term loans to act as an "intermediary" in placing this type of loan. Borrower agreed to this suggestion of Broker and authorized Broker to proceed.

Broker contacted Feinberg, also located in the Chicago, Illinois, area, and asked if he could place these notes with a suitable lender. Feinberg agreed to try to find a lender and, thereafter, contacted the Polish Roman Catholic Union of America (hereinafter "Lender"). Lender told Feinberg that it would be willing to loan Borrower the $300,000 on long-term notes at an interest rate of six percent (6%). Feinberg informed Broker of this and added that his "finder's fee" would be an additional two percent (2%) over the length of the loan, thereby increasing the rate of interest payable by Borrower to eight percent (8%), consisting of six percent (6%) on the notes and two percent (2%) for Feinberg. Broker relayed the information to Borrower in Philadelphia, adding that its own broker's commission would,

in addition to the eight percent, be a flat three percent (3%) of the face amount of the loan.

After a Board of Directors meeting, the president of Borrower notified Broker that the Board of Directors felt that it could not justify payment of the two percent (2%) finder's fee over the fifteen-year term. The question of Feinberg's commission was then discussed between Broker and Feinberg. An alternative suggested by Feinberg, as a means to overcome the question of his commission being paid over a fifteen-year term, was that he be paid outright a lump sum. In order to do this, Feinberg suggested that one means would be to increase the principal amount of the loan from $300,000 to $350,000, leaving the interest rate at six percent (6%) over the fifteen-year term, and use the additional $50,000 as the bulk of the sum he would be entitled to as a finder's fee. Broker transmitted this suggestion to Borrower who, in turn, agreed to increase the principal loan from $300,000 to $350,000 and, out of this, pay an amount of $57,873.54 in one lump sum to Feinberg. This sum would be substantially equivalent to two percent (2%) of $300,000 payable over a fifteen-year period, reduced to present worth.[1] Lender also agreed to this arrangement.

Thereafter, Borrower and Lender commenced formal negotiations concerning the loan in the increased amount of $350,000. After many weeks of what apparently were good faith efforts by the Borrower and the Lender to arrive at an extensive formal note purchase agreement, they were unable to mutually concur to certain material terms of that agreement. As a consequence, the loan transaction was finally abandoned in December, 1967, nearly ten months after Borrower's president had first contacted its Broker in Chicago seeking to borrow on the strength of its corporate notes. Neither Borrower nor Lender pursued

---

1. Borrower and Feinberg did not communicate directly; all information touching on this transaction was relayed and exchanged through the Broker. Borrower did not even know that Feinberg was the "intermediary" whom Broker obtained to find the Lender.

the matter further, nor have they made a claim of any kind upon the other as a result of their involvement in the loan attempt.

Despite the failure of Borrower and Lender to consummate the loan, Feinberg alleges that there was a contract between himself and the defendant, Borrower, and that he is entitled to be paid because he rendered the performance expected of him by Borrower. He contends that the performance on his part was simply to locate and make available to Borrower a lender "ready, willing and able" to lend. He states in this law suit that he has rendered this performance and that he is entitled to receive in payment therefor the sum of $57,873.54, being the amount the defendant promised to pay.

 A Federal Court in a diversity case must apply the rules in respect to the conflict of laws that are followed by the state in which it is sitting. Klaxon Co. v. Stenton Elevator Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Neville Chemical Co. v. Union Carbide Corp., 422 F.2d 1205 (3rd Cir., 1970). The conflict of laws rule used by the State of Pennsylvania is that the forum should look to the law of the state of the place with the most significant relationship to the parties in a transaction, sometimes referred to as the "center of gravity," for the law governing the contractual rights of the parties. Neville Chemical Co. v. Union Carbide Corp., *supra*, at p. 1211; Griffith v. United Airlines, Inc., 416 Pa. 1, 203 A. 2d 796 (1964). Although most of the parties involved in the transaction in question are physically located in the State of Illinois, the "center of gravity" appears to the Court to be in Pennsylvania. Pennsylvania is the principal place of business of the defendant, who was to be the obligor on the ultimate loan transaction; it is the place where

the contract negotiations between the Borrower and the Lender began; it is the place where the decisions of the Borrower with respect to the terms of the note purchase agreement were considered by their Board of Directors; it is the place where the last decision resulting in the break off of loan negotiations took place; it is the place from which payments to the Broker by the Borrower, payments to Feinberg, and payments to the Lender were to be made; it is the forum state chosen by plaintiff, Feinberg, a resident of Illinois.[2]

The facts disclose that there were three separate, yet interdependent, agreements touching on the loan transaction. Those agreements were between Borrower and Broker, between Borrower and Feinberg, and between Borrower and Lender.

## I. AGREEMENT BETWEEN BORROWER AND BROKER

 The agreement between Borrower and Broker was basically an agency agreement. Because the Borrower's original intention to have Broker place the long-term notes with a lender could not come about, Borrower authorized the Broker to use an "intermediary" for this purpose. The Court finds that by employing an "intermediary" on behalf of the Borrower, the Broker was acting as an agent of the Borrower. Regardless of the words used by the parties, or by whatever name the transaction is described, if the facts fairly disclose that one party is acting for or representing another party, by the latter's authority, a relationship of agency exists. *See,* 2 W. Jaeger, Williston on Contracts (hereinafter "Williston"), § 274 (3rd Ed. 1959); 1 P.L.E. Agency, § 5 (1957).

## II. AGREEMENT BETWEEN BORROWER AND FEINBERG

 When a request for a performance is made under circumstances that a

2. Although we find the applicable law to be that of Pennsylvania, we note that the case involves questions governed by the general common law of contracts, which is substantially the same in Illinois as in Pennsylvania.

reasonable person would infer an intent by the requestor to pay for it, the request amounts to an offer and a contract is created when the performance is rendered. Williston, § 36; *see also*, 8 P.L.E. Contracts, § 6 (1971), and cases cited therein. In the case at hand, the performance requested of Feinberg was to find a lender "ready, willing and able to lend." This he did and, at that point, a valid contract was created. That the parties intended payment for the services is evidenced by the fact that they bargained and agreed to the amount, method, and time for the payment.

Although the request to perform came to Feinberg through the Broker, it was made on the authority of the Borrower and as a result of the agency agreement between Borrower and Broker.

## III. AGREEMENT BETWEEN BORROWER AND LENDER

By its letter of October 6, 1967, Lender agreed to the general terms of the loan requested by the Borrower, i. e., $350,000 at six percent (6%) interest over fifteen years with no sinking fund. Such a letter, commonly called a "letter of commitment," is not the final agreement but is merely an agreement to be bound by the terms of the commitment when such are embodied in the final note purchase agreement. The note purchase agreement is a final embodiment of all the terms of the contract; it is a detailed document drafted by the counsel for the Lender and submitted to the Borrower for his approval and signature. In the situation at hand, certain terms of the note purchase agreement not previously agreed to did not meet with the Borrower's satisfaction. As a result of Borrower's dissatisfaction, there was no meeting of the minds on certain material terms of the note purchase agreement and, consequently, no contract for the loan was created.

## IV. TERMS OF THE CONTRACT BETWEEN BORROWER AND FEINBERG

 The agreement between Borrower and Feinberg is the subject matter of this law suit. Having decided that a valid contract existed between Borrower and Feinberg, we now turn our attention to the terms of that contract and, more specifically, to whether Borrower's promise to pay was conditional on a fact or occurrence which did not come about. A conditional promise may be defined as a promise so qualified that a duty of immediate performance will not arise until some condition exists or will cease after some condition exists. Restatement of Contracts, § 254 (1932); 8 P.L.E. Contracts, § 261 (1971). Whether a contract contains a condition, the nonfulfillment of which excuses performance, depends upon the intent of the parties to be ascertained from a fair and reasonable construction of the language used in light of all the surrounding circumstances when they executed the contract. Williston, Contracts, § 666; 8 P.L.E. Contracts § 263 (1971).

Miller v. Corson, 321 F.Supp. 861 (E.D.Pa.1971), involved almost the exact situation we are faced with here. Plaintiff, Miller, pursuant to an oral agreement, supplied the defendant, Corson, with a lender "ready, willing and able to lend" the amount required. The lender proposed certain conditions as to interest, time, etc., which the defendant considered and refused. Miller made a demand to the defendant for his commission and was turned down on the ground that, since the loan was never made, no commission was owing. Applying Pennsylvania law, the Court found that absent a prior agreement to the contrary Miller was to earn his commission by producing a lender willing and able to loan funds on terms which were satisfactory to the defendant.[3]

---

3. The Court considers the law of Illinois to be substantially the same as the law of Pennsylvania on this point.

The case of John F. Fleming, Inc. v. Beutel, 395 F.2d 21 (7th Cir. 1968), although dealing with a real estate broker's commission, uses the same reasoning and comes to the same conclusion as the *Miller* case: "Under the law of Illinois, a broker earns his commission when he produces a purchaser ready, willing, and able to buy on terms acceptable to the seller." [395 F.2d at 24.]

The *Miller* court went on to say that the test is not whether the person ought to be satisfied but whether he is satisfied, there being, however, this limitation that any dissatisfaction must be genuine and not prompted by caprice or bad faith. Miller v. Corson, at p. 863.

Based on an examination of the relevant circumstances surrounding the transaction at hand, we conclude, like *Miller*, that absent a showing of an agreement to the contrary or a showing of bad faith on the part of the Borrower, the Borrower's promise to pay Feinberg was conditional upon Borrower's satisfaction with the terms of the note purchase agreement.

Not only is there a lack of evidence of an agreement to the contrary, but there are indications that Feinberg understood that the obligation to pay would and could not come about until after the loan had been actually consummated. By letter of October 11, 1967, Borrower promised to pay Broker "at settlement" $68,373.54, which amount represented both Broker's three percent (3%) commission of the face amount of the loan ($10,500) and Feinberg's two percent (2%) commission over the life of the loan reduced to present worth ($57,873.-54). On that same day, Broker wrote to Feinberg informing him that, "upon receipt" of these funds from Borrower, Broker would pay Feinberg his share. The reference to payment coming about "at settlement" contemplates that there would be a settlement, therefore, quite obviously, a consummated loan.

The initial suggestion by Feinberg with regard to commission was that he be paid over the life of the loan. This clearly indicates an understanding that he would be paid out, as the Lender was being paid out, over the fifteen-year term. This, too, quite obviously, indicates an acceptance and understanding by Feinberg that a loan would have to be consummated before an obligation to pay him was imposed upon the Borrower.

Finally, the basis for the Borrower not going through with the loan transaction was clearly justified and, hence, can only be termed as having been done in good faith. Over the nine-month span between the time Borrower originally intended to obtain the loan and the drafting and discussion of the final note purchase agreement, Borrower's financial condition declined and a merger with another company was contemplated. Under the note purchase agreement drafted by Lender's counsel, such a merger, where Borrower was not the surviving company, would put Borrower in default. Also, a proposed notice under the agreement to Borrower's long-term creditors revealing the fee arrangement would have been, in Borrower's mind, damaging to its credit standing. On these grounds, Borrower refused to sign the note purchase agreement. The Court finds that neither of these grounds for refusing to sign the agreement was capricious or in bad faith.

By reason of the foregoing, it is clear that the plaintiff cannot prevail in this action and the Court will enter its Order accordingly.