**FLORIDA COIN EXCHANGE**

v.

**FILM CORPORATION OF AMERICA: National Minting Distribution Center, Inc.; Richard Squire, Esquire and Harvey Luterman, Esquire.**

Civ. A. No. 81–4225.

United States District Court,
E. D. Pennsylvania.

Nov. 11, 1981.

Frank Murphy, Norristown, Pa., for plaintiff.

David S. Katz, Fort Washington, Pa., for National Mint.

Steven Angstreich, Philadelphia, Pa., for Film Corp.

Other defendants not represented.

## ADJUDICATION

DITTER, District Judge.

This case comes before the court on a motion for a preliminary injunction to preclude an arbitration proceeding. Following a hearing, I decided the injunction should be granted. As a result of the pleadings and the evidence at that hearing, I make the following

## FINDINGS OF FACT

1. Florida Coin Exchange (Florida), Film Corporation of America (FCA), and National Minting Distribution Center, Inc. (National Mint) entered into a joint venture to sell New Orleans Silver Dollars by direct mail.

2. The terms governing the joint venture were contained in a written agreement dated September 23, 1980.

3. The September 23, 1980, agreement provided, *inter alia,* that

    (a) The proceeds of the joint venture after advances and expenses were deducted, were to be distributed 25 percent each to Florida and FCA, and 50 percent to National Mint.

    (b) Any disputes regarding whether a particular cost or expense was ordinary and necessary would be settled by arbitration in accordance with the rules of the American Arbitration Association.

    (c) When called upon, Florida and FCA would advance the necessary monies to fund the direct mail solicitation program.

    (d) A failure by Florida or FCA to advance monies when called upon to do so would be treated as written notice by that party to terminate its participation in the joint venture, that an accounting would be prepared as of the date of termination, and that all advances less expenses and costs would be returned.

4. In September or October, 1980, Florida and FCA each advanced $5,000. to fund a test mailing.

5. In December, 1980, Florida was called upon to advance $70,000. to fund a second mailing.

6. Not having received any information regarding the results of the test mailing, Florida ignored the request for $70,000.

7. Profits were realized from the test mailing.

8. Prior to the second mailing, an agreement dated January 23, 1981, was entered into by FCA and National Mint providing, *inter alia*, that

    (a) By failing to advance the money as requested, Florida had withdrawn from the joint venture as provided by the terms of the September 23, 1980, agreement.

    (b) Florida's original advance of $5,000. plus or minus any profit or loss from the test mailing, would be re-invested to help fund the second mailing.

    (c) Profits from the second mailing would be distributed in accordance with a specified formula, but limiting Florida to a maximum of four percent.

9. No accounting was rendered as of the date of Florida's alleged withdrawal from the joint venture and none of Florida's funds were returned, as required in the September 23, 1980, agreement.

10. The second mailing contained 500,-000 pieces and realized approximately $300,-000. in profits before miscellaneous expenses were deducted.

11. In May, 1981, Florida received $5,000. from FCA and National Mint representing the money Florida advanced towards the test mailing in September, 1980.

12. Any profit realized by Florida from the first two mailings was not returned to it and remained available to help fund a third mailing.

13. The third mailing containing one million pieces realized approximately $500,-000. in profits before miscellaneous expenses were deducted.

14. In May, 1981, a dispute arose between FCA and National Mint regarding the distribution of the $300,000. from the second mailing.

15. On May 19, 1981, FCA and National Mint entered into an agreement which provided, *inter alia*, that

    (a) Specified sums of money would be distributed to FCA and National Mint.

    (b) Any dispute regarding whether a particular cost or expense was ordinary and necessary would be decided by arbitration.

    (c) FCA and National Mint each would select an arbitrator and that the two chosen arbitrators would select a third.

    (d) The arbitration award would be binding and not subject to appeal.

16. Pursuant to the procedure delineated in the May 19, 1981, agreement, both FCA and National Mint selected arbitrators. These arbitrators selected a third arbitrator.

17. The three arbitrators are named defendants in this lawsuit.

18. On July 7, 1981, Florida attempted to intervene in the arbitration to represent its own interest regarding whether a particular cost or expense was ordinary and necessary.

19. The arbitrators chosen under the terms of the May, 1981, agreement stated that Florida had no standing to participate in the arbitration proceedings.

20. By this suit, Florida seeks to enjoin that arbitration and, in turn, specifically enforce the arbitration procedures delineated in the September 23, 1980, agreement, under which Florida has standing to participate.

## DISCUSSION

■ The prerequisites for granting a preliminary injunction are that the plaintiff has no adequate remedy at law and will suffer immediate, irreparable harm if relief is not granted, plaintiff has a reasonable probability of success on the merits, the harm inflicted on the defendant if the injunction is granted does not outweigh the harm to the plaintiff if relief is denied, and the injunction does not do disservice to the public. *Eli Lilly and Co. v. Premo Pharmaceutical Laboratories, Inc.*, 630 F.2d 120, 136 (3d Cir. 1980); *Continental Group, Inc. v. AMOCO Chemicals Corp.*, 614 F.2d 351, 356–57 (3d Cir. 1980).

Plaintiff has no adequate remedy at law and would have suffered irreparable harm if the preliminary injunction had not been granted. The September 23, 1980, agreement provided that Florida, FCA, and National Mint each could require settlement of disputes concerning costs and expenses through arbitration pursuant to the rules of the American Arbitration Association. This was important because any determination that particular costs or expenses were ordinary and necessary lowered the net distributive share of each party. To exclude Florida from such an arbitration curtails Florida's right to participate, voice its objections to, or represent its own interest in a determination that ultimately affects the returns from its original $5,000. investment. Because the right to participate in the arbitration is nonquantifiable, Florida has no adequate remedy at law. Additionally, if the arbitration was allowed to proceed without Florida, Florida would suffer irreparable harm because a determination would be made affecting its property. The right sought to be protected here is not Florida's entitlement to a specific sum of money; rather, it is Florida's right to participate in the determination of how that sum should be calculated. See *A.L.K. Corp. v. Columbia Pictures Industries, Inc.*, 440 F.2d 761, 763 (3d Cir. 1971); *Rumbaugh v. Beck*, 491 F.Supp. 511, 518 (E.D.Pa.1980). If Florida is not allowed to participate in the arbitration proceedings, it might face the impossible burden of trying to convince a court that a decision by three arbitrators chosen wholly by others, after a hearing at which Florida was not present and based on evidence of which Florida has no knowledge, had so abused their discretion that the proceedings should be set aside. The only effective way Florida can be protected is if the gross revenue from the three mailings is kept intact until the various rights of the parties are examined and sorted out.

Florida has a reasonable likelihood of success on the merits because its interest in the joint venture did not terminate despite the fact that it did not advance money when called upon to do so. The September 23, 1980, agreement specified that if one party withdrew from the joint venture, an accounting would be rendered as of the date of the withdrawal and that unexpended funds would be returned. When Florida failed to advance money in December, 1980, for the second mailing, FCA and National Mint purported to terminate the joint venture. However, no accounting was rendered. No money was returned to Florida. Instead, FCA and National Mint announced that Florida had withdrawn from the joint venture, retained Florida's monetary interest for reinvestment in subsequent mailings, and reduced Florida's share in the profits from the subsequent mailings to a maximum of four percent. If the required accounting and refund was a promise in the September agreement, Florida merely would have an action at law against FCA and National Mint for breach of contract. If, however, the accounting and refund were conditions to treating Florida as having withdrawn from the joint venture, FCA's and National Mint's failure to comply with these requirements negated their ability to oust Florida.

Where words in a contract raise no duty in and of themselves but rather modify or limit the promisees' right to enforce the promise such words are considered to be a condition. Whether words constitute a condition or a promise is a matter of the intention of the parties to be ascertained from a reasonable construction of the language used, considered in light of the surrounding circumstances.

*Burger King Corp. v. Family Dining, Inc.*, 426 F.Supp. 485, 492 (E.D.Pa.1977). See *Feinberg v. Automobile Banking Corp.*, 353 F.Supp. 508, 512 (E.D.Pa.1973).

The purpose of the September 23, 1980 agreement was to establish a joint venture among three parties, wherein two of them, Florida and FCA, would supply money to fund the operation. If either failed to supply the required funds and thus gave notice to the others of its intention to withdraw, an accounting was necessary to allow a segregation of the withdrawing party's monetary interest. Absent a segregation

(and return) of the "withdrawing" party's share, there could be no effective exclusion of that party because its funds were still invested in the joint venture, generating additional revenue. Therefore, the accounting and refund required by the September 23, 1980, agreement were conditions to FCA's and National's treating Florida as having withdrawn. As things turned out, notwithstanding the language of the January 23, 1981 agreement which set forth Florida's withdrawal from the joint venture, FCA and National Mint effectively prevented any withdrawal by reinvesting Florida's money in the second and third mailings. Therefore, Florida still has rights under the September 23, 1981 agreement to compel and participate in an arbitration according to the terms of that agreement, on the issue of ordinary and necessary expenses.

Because the money in dispute is invested in high yield money market funds, a preliminary injunction will not cause great harm to FCA and National Mint. On the other hand, denying relief to Florida and allowing an arbitration to proceed without its participation, would jeopardize Florida's hope of ever getting its just share of the profits or allowing it an opportunity to be heard to protect its interest. Furthermore, the preliminary injunction will not affect the public interest.

Having fulfilled all the prerequisites for a preliminary injunction, Florida's motion is granted. A date will be set for a hearing on a permanent injunction.

### CONCLUSIONS OF LAW

1. This court has jurisdiction of the parties and the controversy.

2. Florida Coin has demonstrated its entitlement to a preliminary injunction by showing

(a) It has no adequate remedy at law;

(b) It will suffer immediate, irreparable harm if relief is not granted;

(c) It has a reasonable probability of success on the merits;

(d) The harm inflicted on the defendants by the grant of the injunction does not outweigh the harm to the plaintiff that would result from a denial of the injunction; and

(e) The injunction does no disservice to the public.

3. Florida Coin's motion to preclude arbitration of matters pertaining to determining what are ordinary and necessary expenses without Florida Coin's participation was properly granted.