The AMERICAN ORIGINAL CORPORATION, a Maryland corporation, Plaintiff,

v.

LEGEND, INC., a New Jersey corporation, and Smooth Saturn, Inc., a New Jersey corporation, Defendants.

Civ. A. No. 86–309–JLL.

United States District Court,
D. Delaware.

Dec. 30, 1986.

F. Michael Parkowski and I. Barry Guerke of Parkowski, Noble & Guerke, Dover, Del., for plaintiff.

Allen M. Terrell, Jr., of Richards, Layton and Finger, Wilmington, Del., and Richard L. Bazelon and Jeffrey A. Less of Bazelon, Less and Price, Philadelphia, Pa., for defendants.

## MEMORANDUM OPINION

LATCHUM, Senior District Judge.

Plaintiff American Original Corporation (the "plaintiff") filed this action initially in the Superior Court of the State of Delaware claiming that Legend, Inc. and Smooth Saturn, Inc. (collectively the "defendants"), breached a contract (the "Contract") with the plaintiff by selling their catch of surf clams to competitors of the plaintiff. (*See* Docket Item ["D.I."] 1 at Exhibit ["Ex."] A.) Defendants promptly removed the action to this Court, alleging diversity jurisdiction under 28 U.S.C. § 1332. *See* 28 U.S.C. § 1441 (1973). Once in this Court, defendants filed a timely answer,[1] denying liability and setting forth a two count counterclaim. (*See* D.I. 6.) Presently before the Court is plaintiff's motion to dismiss both counts of the defendants' counterclaim for failure to state a claim upon which relief can be granted. (*See* D.I. 9.) For the reasons stated in this Memorandum Opinion, the Court will deny plaintiff's motion.

## BACKGROUND

Plaintiff is a processor of surf clams and quahogs. (*See* D.I. 1 at Ex. A, ¶ 1.) Defendant Legend, Inc., owns a vessel known as the Legend. (*See* D.I. 11 at ¶ 5.) Defendant Smooth Saturn, Inc., owns a vessel known as the Smooth Saturn. (*See id.*) Both vessels are former oil rigs converted by the defendants for use as clam fishing vessels. (*See id.*)

After negotiations, plaintiff and defendants entered into the Contract[2] whereby the plaintiff agreed to purchase and the defendants to sell "a maximum of 1000

---

1. The defendants filed an amended answer after the plaintiff filed its motion to dismiss. (*See* D.I. 11.) The amended answer basically sets forth the same allegations as the original answer, the only notable change being the deletion of the word "fraudulent" from paragraph 30 of the original answer. (*See* D.I. 6 at ¶ 30; D.I. 11.)

2. The plaintiff sent the Contract to the defendants in the form of a letter written by the plaintiff's president to the defendants' registered agent. (*See* D.I. 1 at App. A, attachment.) A copy of the Contract is appended to this opinion.

cages of quahogs" and "all surf clams" caught by the defendants' vessels in certain waters. (*See* D.I. 11 at ¶ 6.) The quahogs were to be caught during the vessels' shakedown period prior to early 1986. (*See* D.I. 1 at Ex. A, attachment.) The vessels would then leave for New England where they would fish for surf clams in Georges Bank and Nantucket Shoals. (*See id.*) The agreement further stated that the plaintiff was to supply adequate cages for the defendants' fishing operations. (*See id.*)

In January of 1986, defendants informed the plaintiff of their vessels' readiness to fish for quahogs and requested that the plaintiff supply adequate cages for that purpose, as provided for in the Contract. (*See* D.I. 11 at ¶ 7.) The defendants contend that the plaintiff refused to provide sufficient cages for quahog fishing. (*See id.* at ¶ 8.) This failure resulted in a severely limited catch of quahogs for both the Legend and Smooth Saturn. (*See id.* at ¶¶ 8–9.)

In February of 1986, the plaintiff informed the defendants of its intention not to supply cages to the defendants or purchase any surf clams caught by the defendants vessels. (*See id.* at ¶ 11.) After receiving this information, the defendants secured short term agreements from other processors, and thus the Legend and Smooth Saturn departed for New England to catch surf clams in March of 1986. By virtue of these and other short term agreements, the defendants were able to catch some surf clams and sell them to other processors. (*See id.* at ¶¶ 18–19.)

With the exception of 68 cages of surf clams caught in cages supplied by the plaintiff earlier for quahog fishing, the plaintiff refused to supply any cages for defendants' surf clam fishing or to purchase any surf clams. (*See id.* at ¶ 13.) The defendants allege that the plaintiff's failure to supply adequate cages for surf clam fishing and its refusal to purchase the limited amount of surf clams caught severely damaged its fishing operations in 1986. (*See id.*)

Plaintiff instituted this suit in June of 1986 alleging that the defendants breached the Contract by selling surf clams to plaintiff's competitors. (*See* D.I. 1 at Ex. A, ¶ 8.) Defendants' answer denied that the defendants breached the Contract and alleged a two count counterclaim. (*See* D.I. 11.) Count one of the defendants' counterclaim requests in excess of $350,000 in compensatory damages as a result of the plaintiff's repudiation of the Contract. (*See* D.I. 11 at ¶¶ 1–24.) Count Two prays for over $350,000 in compensatory damages and $100,000 in punitive damages, alleging that plaintiff breached the Contract with malice and bad faith. (*See id.* at ¶¶ 25–39.)

## ANALYSIS

Plaintiff urges this Court to dismiss the defendants' counterclaim for failure to state a claim upon which relief can be granted, under Federal Rule of Civil Procedure 12(b)(6). (*See* D.I. 9.) Plaintiff must overcome a formidable burden if its motion is to succeed. Courts may grant a motion for failure to state a claim only when it appears beyond doubt that the non-moving party "can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Paolino v. Channel Home Center,* 668 F.2d 721, 722 (3d Cir.1981). Further, a court considering a motion to dismiss for failure to state a claim must accept, as true, all of the well pleaded allegations in the non-moving parties' claim, drawing all reasonable inferences therefrom in the light most favorable to that party. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972); *Rogin v. Bensalem Township,* 616 F.2d 680, 685 (3d Cir.1980). Thus, this Court's role is a limited one: the Court must examine the pleadings in the light most favorable to the defendants and if the defendants could prove any set of facts that would entitle them to relief under their counterclaim, the plaintiff's motion must fail.

A court deciding a motion to dismiss for failure to state a claim must base its decision solely on the pleadings and may not consider extrinsic evidence without turning the motion into a request for summary judgment. *JM Mechanical Corp. v. U.S. BY U.S. Dept. of HUD,* 716 F.2d 190, 197 (3d Cir.1983). In deciding the present motion, the Court has considered the language of the Contract only because it is appended to the complaint and paraphrased in both the complaint and answer *in toto.*

Plaintiff offers three independent grounds in support of its motion to dismiss Count One of the defendants' counterclaim and two separate grounds for dismissing Count Two. (*See* D.I. 12.) Since plaintiff's contentions each involve distinct legal issues, this Court will discuss each of them separately.

## I. Did Plaintiff Breach A Valid Contract

Plaintiff contends that the defendants can prove no set of facts establishing that plaintiff breached a valid contract. (*See id.* at 12 to 14.) Plaintiff alludes to several legal theories in support of this conclusion, some of which intermix in a way the Court found difficult to understand. However, there appear to be three discernable theories worthy of discussion.

First, plaintiff contends that the parties never intended the letter, written by its president and signed by both parties, to constitute a binding contract. The plaintiff argues that the letter only manifested an "arrangement engendering a series of separate contracts." (*See id.* at 14.) Plaintiff insists that the letter was in no way binding upon the parties but served only as

a price schedule which the parties would follow in the event that future contracts for shipments of clams were made. (*See id.* at 13.) This argument leads to the conclusion that no enforceable contract ever existed between the parties.

The Court finds the plaintiff's position without merit and somewhat incongruous. The language of the Contract unambiguously indicates the parties' intention to enter into a binding contract. The Contract begins: "[T]his letter will serve to confirm the agreement reached last evening." (*See* D.I. 1 at Ex. A, attachment.) It goes on to express the terms of the Contract, using words of commitment and legal terms of art: "American Original agrees," "American Original will limit," "It is agreed," and "In consideration of the above." (*See id.*) There is no indication that the parties intended this agreement to be only an "arrangement" which either party could repudiate at will.

More importantly, the Court finds this argument, along with plaintiff's second point discussed below, to be extremely disconcerting. Both of these arguments lead to the conclusion that no valid contract existed between the plaintiff and the defendants. However, the plaintiff instituted this suit seeking damages for the defendants' alleged breach of the Contract. (*See* D.I. 1 at Ex. A, ¶ 8.) This Court is at a loss to understand how the plaintiff's attorney, presumably cognizant of Rule 11,[3] signed a complaint alleging a breach of a valid contract, with a request for damages (*see* D.I. 1 at Ex. A, prayer for relief ¶ 1), and two briefs arguing repeatedly that no valid contract existed between the parties.[4] (*See*

---

**3.** Revised Federal Rule of Civil Procedure 11 places an affirmative duty upon parties and their attorneys to investigate the accuracy of all pleadings, motions, and other papers filed with the court. The Rule provides for sanctions if a party or an attorney fails to comply with its provision. Fed.R.Civ.P. 11.

**4.** Because of the inconsistency it would create, the Court was at first hesitant to ascribe such an interpretation to plaintiff's arguments. However, plaintiff asserted that: (1) no enforceable output or requirement contract exists (*see* D.I.

12 at 13); (2) the contract is unenforceable because it is illusory (*see id.* at 14); (3) the parties intended the letter only as a manifestation of an arrangement contemplating future separate contracts (*see id.* at 13–14); and (4) this contract falls into the first category of contracts discussed in *City of Lakeland, Florida v. Union Oil Co. of California,* 352 F.Supp. 758, 764 (M.D. Fla.1973), which that court characterized as invalid (*see* D.I. 14 at 6). Based on all of the above, the Court concludes that plaintiff was arguing that the contract is invalid.

D.I. 12; 14.) At the very least this inconsistency detracts from the persuasiveness of the plaintiff's arguments.

The second argument discernible in plaintiff's brief is that even if the parties intended to enter into a contract, the Contract is not enforceable because it is illusory. (*See* D.I. 12 at 14.) Plaintiff insists that the Contract gave it absolute control as to the quantity of clams it wished to purchase from the defendants. (*See id.* at 12.) Thus, the plaintiff maintains, the Contract was an indefinite quantities contract and unenforceable for want of mutuality of obligation. (*See id.* at 14.)

The defendants deny that the Contract gave the plaintiff any control over the quantity of clams purchased. (*See* D.I. 13 at 9.) Instead the defendants contend that the plaintiff was bound by a valid output contract to purchase all of the surf clams and up to 1000 cages of quahogs, caught by the defendants' vessels during the applicable periods. (*See id.* at 9–11.)

 The Court finds the defendants' arguments persuasive. Since the Contract contains separate provisions relating to the sale of surf clams and the sale of quahogs, the Court will discuss the validity of the Contract with respect to each type of clam separately. As to surf clams, the Contract states that the defendants must sell, to the plaintiff, all of the surf clams caught by the Legend and Smooth Saturn while fishing at Georges Banks or Nantucket Shoals. (*See* D.I. 1 at Ex. A, attachment.) Contracts which measure quantity by referring to the output of the seller or requirements of the buyer are valid in Delaware. *Del. Code Ann.* tit. 6, § 2–306 (1975). Such contracts are considered to be for the actual output or requirements that occur, and are thus not void for want of mutuality or specificity. *See id.* at comment 1. The language of the Contract indicates that the parties intended to enter into a binding output contract for surf clams. The defendants agreed to sell all of its surf clams caught in certain waters to the plaintiff. Although there appear to be no Delaware cases on point, many courts from other jurisdictions have held the term "all," when used in reference to the seller's goods, to be sufficient to create a valid output contract. *See In the Matter of the Estate of Frost*, 130 Mich.App. 556, 344 N.W.2d 331 (1983) ("all trees"); *Harris v. Hine*, 232 Ga. 183, 205 S.E.2d 847 (1974) ("all cotton produced on their 824 acres"); *Port City Construction Co. v. Henderson*, 48 Ala. App. 639, 266 So.2d 896 (1972) ("all concrete" for a slab). Based on these decisions and the clear language of the Contract, this Court finds the parties' agreement for the sale of "all surf clams" to be a valid output contract.

On the other hand, the Contract does not provide for the sale of all quahogs caught by the defendants' vessels. Instead it states that the plaintiff agrees to purchase "a maximum of 1000 cages of quahogs" from the defendants. (*See* D.I. 1 at Ex. A, attachment.) Further, the Contract provides that the plaintiff would control the scheduling of the defendants' quahog catches. (*See id.*)

Both of these provisions are ambiguous and subject to more than one interpretation. For example, the language concerning the maximum amount of quahogs to be purchased could mean that the plaintiff agreed to purchase all of the defendants' quahogs up to a maximum of 1000 cages. Once the defendants caught over 1000 cages, the plaintiff could purchase more cages at its discretion. Alternatively, the language may indicate the parties' intention that the plaintiff purchase any amount of quahogs it wished so long as that amount did not exceed 1000 cages. Both of these interpretations are reasonable. The provision relating to the defendants' ability to schedule quahog catches is similarly subject to dual interpretations.

Normally when the language of a contract is ambiguous, a court must examine the circumstances surrounding its execution in order to ascertain the intentions of the parties. *DuPont v. Wilmington Trust Co.*, 29 Del. Ch. 7, 45 A.2d 510, 517 (1946). However, since the Court presently is deciding a 12(b)(6) motion, once an ambiguity

arises, the inquiry is at an end. The plaintiff's motion must fail since the defendants, if given a chance, may be able to show that the parties intended the Contract to provide for the sale of all quahogs up to 1000 cages. *See Conley,* 355 U.S. at 45–46, 78 S.Ct. at 101–102. This would mean that a valid output contract existed with regard to the quahogs as well.

Plaintiff attempts to avoid the conclusion that the Contract is valid as to both surf clams and quahogs by focusing on the last sentence of the Contract, which reads: "The American Original Corporation will supply adequate cages for fishing operations." (*See* D.I. 1 at Ex. A, attachment.) Plaintiff interprets this provision as giving it absolute discretion as to the number of cages used by the defendants while fishing, and thus control over the quantity of the defendants' catch. (*See* D.I. 12 at 12–14.) Plaintiff's interpretation of this provision is unsupported by the language of the Contract.

■ In ascertaining the meaning parties intend a contract to have, courts must first examine the language of the instrument. *Jefferson Chemical Co. v. MoBay Chemical Co.,* 267 A.2d 635, 636 (Del.Ch. 1970). When the language chosen by the parties is plain and subject to only one meaning, courts should simply state that meaning and go on. *Id.* at 637. The language of the provision quoted above is plain and unambiguous. The plaintiff was to supply "adequate" cages for the defendants' fishing operations. (*See* D.I. 1 at Ex. A, attachment.) The definition of adequate is "sufficient." Webster's Third New International Dictionary 25 (1971). The plaintiff had no discretion, it was obligated to supply a sufficient number of cages in order for the defendants to properly fish. Thus the Contract is a valid output contract, this provision not withstanding.

Certain judicially created rules of construction also dictate the result reached by the Court. Because plaintiff drafted the Contract (*see* D.I. 1 at Ex. A, attachment), all ambiguities must be construed in the defendants' favor. *Goodman v. Continental Cas. Co.,* 347 A.2d 662, 665 (Del.Super. 1975). Moreover, when faced with two equally reasonable interpretations of a contract, courts should always construe a contract to be valid. *In Re Farm Industries, Inc.,* 41 Del.Ch. 379, 196 A.2d 582, 589 (1963).

In an apparent effort to hedge its bet, plaintiff's third argument is that even if this Court concludes that the Contract is a valid output contract, plaintiff is still not in breach since the Contract does not obligate the plaintiff to purchase any surf clams or quahogs. Once again the Court is astonished by the inconsistencies in the plaintiff's argument. If plaintiff was under no obligation to purchase clams from the defendants, the Contract would be illusory and void. *Mobil Oil Corp. v. Wroten,* 303 A.2d 698, 701 (Del.Ch.), *aff'd,* 315 A.2d 728 (Del.Supr.1973). Thus the situation put forth by the plaintiff, that a valid contract existed but they were not obligated under it to purchase any of defendants' clams, is a legal impossibility. In any event, the Court has concluded that plaintiff did have an obligation to purchase all of the surf clams and may have had an obligation to purchase a maximum of 1000 cages of quahogs caught by the defendants.

In sum, the Court rejects plaintiff's first ground for dismissing Count One of the defendants' counterclaim as unsupported by legal precedent and the language of the Contract.

## II. Does The Contract Violate The Statute Of Frauds

Plaintiff's second ground for dismissing Count One of the defendants' counterclaim is that the Contract is void under the statute of frauds. (*See* D.I. 12 at 19.) The Uniform Commercial Code's statute of frauds, adopted in Delaware, mandates that all contracts for the sale of goods for a price of $500.00 or more be evidenced by a sufficient writing. *Del.Code Ann.* tit. 6, § 2–202. A writing is sufficient if it indicates that a contract exists between the parties, and is signed by the party against whom enforcement is sought. *Id.* The

absence of one or more material terms of the contract does not make the writing insufficient. *Id.* However, the contract is not enforceable beyond the quantity of goods specified. *Id.*

■ The plaintiff argues that the lack of a quantity term makes the Contract unenforceable. (*See* D.I. 12 at 19.) This argument sounds all too familiar having been advanced by the plaintiff and rejected by the Court in part I of this opinion. As noted there, the Contract states a quantity term by indicating that the Contract is for all of the surf clams, and a maximum of 1000 cages of quahogs caught by the defendants in certain waters. (*See* D.I. 1 at Ex. A, attachment.) Courts have held such terms to be sufficient for the purposes of the statute of frauds. *See In the Matter of the Estate of Frost,* 130 Mich.App. 556, 344 N.W.2d at 334. Once a writing contains some indication of quantity, such as the word "all," the contract is valid and courts may accept parol evidence to ascertain the exact amount intended by the parties. *Id.* The comments to section 2–306 also allude to this result in stating that the actual output of the seller, presumably shown by parol evidence, will become the measure of quantity in an output contract. *Del.Code Ann.* tit. 6, § 2–306 comment 1. Thus, the Contract is not in violation of the statute of frauds and may be enforced up to the amount the defendants would have caught had the plaintiff supplied adequate cages.

### III. Was Plaintiff Relieved Of Its Duty Of Performance

Plaintiff's final ground in support of its motion to dismiss Count One of the defendants' counterclaim is that defendants' breach of a material term of the Contract constituted the nonperformance of a condition precedent, relieving plaintiff of its duty of performance under the Contract. (*See* D.I. 12 at 15–18.) This argument does not focus on the sufficiency of the defendants' counterclaim, but suggests a defense to the defendants' claim. A party may move to dismiss a claim based on an affirm-

ative defense if that defense clearly appears on the face of the pleadings. *Williams v. Murdoch,* 330 F.2d 745, 749 (3d Cir.1964).

Plaintiff argues that the defendants breached the Contract by failing to shakedown the vessels and fish for quahogs prior to early 1986, as required by the Contract. (*See* D.I. 12 at 15.) Defendants contend that this provision was not a condition precedent to the plaintiff's performance. (*See* D.I. 13 at 12–14.) The defendants also deny that they breached the Contract in any way. (*See id.*) The Court finds both of the defendants' arguments persuasive.

"A condition precedent is a fact or event which the parties intend must exist or take place before there is a right to performance. . . . If the condition is not fulfilled, the right to enforce the contract does not come into existence." 5 S. Williston, *A Treatise on the Law of Contracts,* § 663 (3d ed. 1961) (quoting *Lach v. Cahill,* 138 Conn. 418, 85 A.2d 481 (1951)). Whether a provision is a condition precedent depends on the intention of the parties, manifested by the language of the contract and the circumstances surrounding its execution. *Burger King Co. v. Family Dining Inc.,* 426 F.Supp. 485, 492 (E.D.Pa.), *aff'd mem.,* 566 F.2d 1168 (3d Cir.1977); 5 S. Williston, *supra,* at § 663.

■ Once again, due to the preliminary nature of plaintiff's motion, the Court need go no further then to point out the presence of certain ambiguities and its belief that facts may exist which, if proven by the defendants, would entitle them to relief. *See Conley,* 355 U.S. at 45–46, 78 S.Ct. at 101–102. Given the chance, the defendants may be able to show that the circumstances surrounding the execution of the Contract indicate that neither party considered the timely shakedown of the defendants' vessels and quahog catch to be a condition precedent of the Contract. Furthermore, there are many factual issues surrounding the plaintiff's allegation that the defendants failed to perform this provision of the Con-

tract. Based on this, the Court cannot grant plaintiff's 12(b)(6) motion.

In conclusion, all three of plaintiff's arguments for dismissal of Count One of the defendants' counterclaim are without merit. The Court will thus deny the plaintiff's motion to dismiss Count One of the defendants' counterclaim for failure to state a claim upon which relief can be granted.

## IV. Is Plaintiff Liable For Punitive Damages Under A Breach Of Contract Theory

■ Plaintiff's first ground in support of its motion to dismiss Count Two of the defendants' counterclaim is that the defendants failed to allege sufficient facts to justify an award of punitive damages under a breach of contract theory. (See D.I. 12 at 22–25.) Plaintiff asserts that "something more" than the intentional breach alleged by the defendants is necessary for a court to award punitive damages under a breach of contract theory. (See D.I. 14 at 11.)

The plaintiff is correct in asserting that the mere intentional breach of a contract will not alone support an award of punitive damages. See Smith v. New Castle County Vo-Tech School Dist., 574 F.Supp. 813, 826 (D.Del.1983). A breaching party's conduct must meet the "wanton and wilful" standard courts employ when awarding punitive damages in tort cases. Reiver v. Murdoch & Walsh, P.C., 625 F.Supp. 998, 1014 (D.Del.1985). When used in the context of contract cases, courts have construed the term "wanton and wilful" to mean "maliciously and without probable cause, for the purpose of injuring [the other party] by depriving him of the benefits of the [contract]." Reiver, 625 F.Supp. at 1015 (quoting Oliver B. Cannon & Sons, Inc. v. Fidelity and Casualty Co., 484 F.Supp. 1375, 1388 (D.Del.1980)).

This is an onerous standard and the Court may doubt that the defendants will be able to overcome it at trial. Nevertheless, reviewing the facts in the light most favorable to the defendants, the Court cannot rule at this stage that the defendants can prove no set of facts in support of their counterclaim which would entitle them to recover punitive damages. See Conley, 355 U.S. at 45–46, 78 S.Ct. at 101–102.

The defendants allege that the plaintiff engaged in a deliberate scheme to "tie up" certain clam vessels, including the Legend and Smooth Saturn, in order to assure the lowest possible price for clams. (See D.I. 11 at ¶ 29.) The defendants contend that the plaintiff did this by purposely contracting for more clams than it needed with the intention of buying clams sold at the lowest price, and breaching its remaining contracts. (See id. at ¶¶ 30–33.) The defendants further allege that the plaintiff engaged in this conduct maliciously, in bad faith, and in deliberate contravention of the Contract. (See id. at ¶¶ 30–37.) It is simply too early in this litigation for the Court to conclude that the defendants can prove no set of facts in support of these allegations that would justify a punitive damage award.

## V. Is Plaintiff Liable Under A Tortious Interference With Prospective Contractual Relations Theory

■ The plaintiff's second ground in support of its motion to dismiss Count Two of the defendants' counterclaim is that Count Two fails to state a valid claim for tortious interference with a prospective contractual relation. (See D.I. 14 at 14–19.) Delaware courts have long recognized the persuasiveness of the Restatement of Torts in the area of contractual interference. See Bowl-Mor Company, Inc. v. Brunswick Corp., 297 A.2d 61, 64 (Del.Ch.1972); Regal Home Distributors, Inc. v. Gordon, 6 Terry 49, 45 Del. 49, 66 A.2d 754 (Del.Super.1949). The Restatement defines tortious interference with a prospective contractual relationship as:

One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of:

(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

(b) preventing the other from acquiring or continuing the prospective relation.

Restatement (Second) of Torts § 766B (1977).

The situation described in subsection (a) is the most common way an action for tortious interference with a prospective contractual relation arises. Typically, a plaintiff and a third party are involved in a prospective contractual relation. The defendant, with the intention of interfering with the plaintiff's relation, induces the third party to not enter into the contract. The inducement is usually a promise of better contractual terms with the defendant or a threat of economic retaliation. *See generally* Restatement (Second) of Torts § 766B comments a-v.

The defendants' claim of interference with a prospective contractual relation differs from the scenario set out above in two important respects. First, the defendants allege that the plaintiff improperly induced them, not a third party, to forego prospective contractual relations. (*See* D.I. 11 at ¶ 36.) As the plaintiff notes, this lack of inducement to a third party would have been fatal to the defendants' counterclaim under the First Restatement. The First Restatement required that a defendant "purposely cause a *third party* not to ... enter into or continue a business relation with another." Restatement (First) of Torts § 766 (1939) (emphasis added). However, the more recent Second Restatement contains no such requirement. A defendant may be liable for interference with prospective contractual relations by inducing either the third party or the plaintiff not to enter into a contract. Restatement (Second) of Torts § 766B.

The second unique aspect of the defendants' counterclaim is the alleged method of interference used by the plaintiff. The defendants contend that the plaintiff interfered with their prospective contractual relations with other processors by virtue of its contract with the defendants. The defendants argue that the plaintiff maliciously entered into the Contract with defendants, with no intention of honoring its provisions, in order to tie up the defendants' vessels and prevent them from selling clams to other processors. (*See* D.I. 11 at ¶¶ 34–39.)

The plaintiff contends that the defendants' claim is nothing more than a breach of contract claim, fabricated to look like a tortious interference case. The plaintiff appears to be concerned that acceptance of the defendants' counterclaim would encourage an onslaught of similar cases. (*See* D.I. 14 at 16.) Initially the Court shared this concern. The plaintiff correctly points out that under the defendants' theory, every time a party contracts to buy a certain quantity of goods from a second party, it necessarily interferes with the prospective contractual relations of the second party and all other prospective purchasers of the goods. However, the plaintiff's argument fails in assuming that every time the first party in the example above breaches the contract, an action for tortious interference of prospective contractual relations arises.

An action for tortious interference of prospective contractual relations does not lie unless the interference is intentional and improper. Restatement (Second) of Torts § 766B. Although many breach of contract cases involve intentional and purposeful conduct, few could be deemed improper. In determining if an interference is improper, courts must consider the factors outlined in Section 767 of the Restatement. These factors take into account the interferer's motive, conduct, and intent. Restatement (Second) of Torts § 767. Thus, only cases of truly tortious conduct will merit recovery under this theory.

The defendants have alleged that the plaintiff entered into the Contract with no intention of honoring its provisions. (*See* D.I. 11 at ¶ 36.) The defendants also allege malice and bad faith on plaintiff's part. (*See id.* at ¶ 37.) The Court cannot rule at this stage of the case that the defendants can prove no set of facts in support of these allegations which would entitle them to relief under Section 766B. *See Conley*, 355 U.S. at 45–46, 78 S.Ct. at 101–102. Consequently, the Court will deny plain-

tiff's motion to dismiss defendants' claim of tortious interference with a prospective contractual relation.

miss Counts One and Two of the defendants' counterclaim. An order will be entered in accordance with this Memorandum Opinion.

## CONCLUSION

Based on the reasons outlined above, the Court will deny plaintiff's motion to dis-

EXHIBIT A

## THE AMERICAN ORIGINAL CORPORATION

P O. BOX 769, 215 HIGH STREET, SEAFORD, DELAWARE 19973-0769
PHONE. (302) 629-3081 · TWX: 510-664-2326

December 4, 1985

Mr. Lee A. Levine
3030 Atlantic Avenue
Atlantic City, New Jersey 08401

Dear Lee:

This letter will serve to confirm the agreement reached last evening between The American Original Corporation and the principals of the Legend and Saturn vessels.

American Original agrees to purchase a maximum of 1000 cages of quahogs from the Legend and Saturn vessels during their shakedown period and prior to going to New England in early 1986. Scheduling of said catches will be at the descretion of American Original – Price $3.00/bu. F.O.B. American Original's Ocean City dock.

American Original will limit its 1986 New England catch to 50,000 bushels. It is agreed that this amount will be reduced by the number of bushels sold to American Original by the Steven "S" during the period January through April, 1986.

In consideration of the above, the pricipals of the Legend and Saturn vessels hereby agree to sell to American Original all surf clams caught by said vessels in New England – (Georges Banks or Nantucket Shoals). The price to be paid for said clams will be as follows:

January – April, 1986 – Prevailing ex-vessel market price/for like (with no deduction for packing & freight) grade and quality – F.O.B. New England dock.

May – August, 1986 – Prevailing ex-vessel market price/for like grade (with no deduction for packing & freight) and quality. F.O.B. New England dock – less $1.00.

Sept. – December, 1986 – Prevailing ex-vessel market price/for like grade and (with no deduction for packing & freight) quality. F.O.B. New England dock.

The American Original Corporation will supply adequate cages for fishing operations.

Accepted: Legend, Inc.

By: _____

_____ Smooth Saturn, Inc. _____

By: _____

_____
A. P. Marvin
President