**BURGER KING CORPORATION**

v.

**FAMILY DINING, INC.**

Civ. A. No. 75–1290.

United States District Court, E. D. Pennsylvania.

Feb. 7, 1977.

Ralph W. Brenner, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., for plaintiff.

John C. Butera, Butera & Detweiler, King of Prussia, Pa., for defendant.

## MEMORANDUM AND ORDER

HANNUM, District Judge.

Presently before the Court is defendant's motion for an involuntary dismissal in accordance with Rule 41(b), Federal Rules of Civil Procedure, advanced at the close of plaintiff's case. The trial is before the Court sitting without a jury.

In bringing the suit plaintiff seeks a determination under the Declaratory Judgment Act, Title 28, United States Code § 2201, that a contract between the parties, by its own terms, is no longer of any force and effect. A request for declaratory relief is appropriate in a case such as this where the primary question is whether such a termination has occurred. See: Wright and Miller, *Federal Practice and Procedure*: Civil § 2765, n. 35.

Jurisdiction of the parties is based on diversity of citizenship in accordance with Title 28, United States Code § 1332(a).

### FACTS ESTABLISHED IN PLAINTIFF'S CASE

Plaintiff Burger King Corporation (hereinafter "Burger King") is a Florida corporation engaged in franchising the well-known Burger King Restaurants. In 1954, James W. McLamore, founder of Burger King Restaurants, Inc. (the corporate predecessor of Burger King) built the first Burger King Restaurant in Miami, Florida. In 1961 the franchise system was still relatively modest size having only about 60 or 70 restaurants in operation outside of Florida. By 1963, however, Burger King began to experience significant growth and was building and operating, principally through franchisees, 24 restaurants per year. It was also at this time that Burger King's relationship with defendant Family Dining, Inc., (hereinafter "Family Dining") was created.

Family Dining is a Pennsylvania corporation which at the present time operates ten Burger King Restaurants (hereinafter "Restaurant") in Bucks and Montgomery Counties in Pennsylvania. Family Dining was founded and is currently operated by Carl Ferris who had been a close personal friend of McLamore's for a number of years prior to 1963. In fact they had attended Cornell University together in the late 1940's. It would seem that this friendship eventually led to the business relationship between Burger King and Family Dining which was conceived in the "Burger King Territorial Agreement" (hereinafter "Territorial Agreement") entered on May 10, 1963.

In accordance with the Territorial Agreement Burger King agreed that Family Din-

ing would be its sole licensee, and thus have an "exclusive territory," in Bucks and Montgomery Counties provided Family Dining operated each Restaurant pursuant to Burger King license agreements[1] and maintained a specified rate of development. Articles I and II of the Territorial Agreement (Plaintiff's Exhibit P–2) are pertinent to this dispute. They provide as follows:

### I.

For a period of one year, beginning on the date hereof, Company will not operate or license others for the operation of any BURGER KING restaurant within the following described territory hereinafter referred to as "exclusive territory," to-wit:

The counties of Bucks and Montgomery, all in the State of Pennsylvania

as long as licensee operates each BURGER KING restaurant pursuant to BURGER KING restaurant licenses with Company and faithfully performs each of the covenants contained.

This agreement shall remain in effect and Licensee shall retain the exclusive territory for a period of ninety (90) years from the date hereof, provided that at the end of one, two, three, four, five, six, seven, eight, nine and ten years from the date hereof, and continuously thereafter during the next eighty years, Licensee has the following requisite number of BURGER KING restaurants in operation or under active construction, pursuant to Licenses with Company:

One (1) restaurant at the end of one year;

Two (2) restaurants at the end of two years;

Three (3) restaurants at the end of three years;

Four (4) restaurants at the end of four years;

Five (5) restaurants at the end of five years;

Six (6) restaurants at the end of six years;

Seven (7) restaurants at the end of seven years;

Eight (8) restaurants at the end of eight years;

Nine (9) restaurants at the end of nine years;

Ten (10) restaurants at the end of ten years;

and continually maintains not less than ten (10) restaurants during the next eighty (80) years.

Licensee and company may mutually agree to the execution of a restaurant license to a person other than the Licensee, herein, if such restaurant license is executed same will count as a requisite number as set forth in paragraph above.

### II.

If at the end of either one, two, three, four, five, six, seven, eight, nine or ten years from the date hereof, or anytime thereafter during the next eighty (80) years, there are less than the respective requisite number of BURGER KING operations or under active construction in the "exclusive territory" pursuant to licenses by Company, this agreement shall terminate and be of no further force and effect. Thereafter, Company may operate or license others for the operation of BURGER KING Restaurants anywhere within the exclusive territory, so long as such restaurants are not within the "Protected Area", as set forth in any BURGER KING Restaurant License to which the Licensee herein is a party.

The prospect of exclusivity for ninety years was clearly intended to be an inducement to Family Dining to develop the territory as prescribed and it appears that it had exactly this effect as Family Dining was to become one of Burger King's most successful franchisees. While Burger King considered Carl Ferris to be somewhat of a problem at various times and one who was overly meticulous with detail, it was nevertheless through his efforts which included obtaining the necessary financing and assuming significant risks, largely without assistance from Burger King, that enabled

---

1. Each Restaurant is opened pursuant to a separate Burger King license agreement.

both parties to benefit from the arrangement.

On August 16, 1963, Family Dining opened the First Restaurant at 588 West DeKalb Pike in King of Prussia, Pennsylvania. The second Restaurant was opened on July 2, 1965, at 409 West Ridge Pike, Conshohocken, Pennsylvania, and the third Restaurant was opened October 19, 1966, at 2561 West Main Street, Norristown, Pennsylvania.

However, by April, 1968, Family Dining had not opened or begun active construction on a fourth Restaurant which, in accordance with the development rate, should have been accomplished by May 10, 1967, and it was apparent that a fifth Restaurant would not be opened by May 10, 1968, the date scheduled. On May 1, 1968, the parties entered into a Modification of the Territorial Agreement (hereinafter "Modification") whereby Burger King agreed to waive Family Dining's failure to comply with the development rate. (Plaintiff's Exhibit P–4). There is nothing contained in the record which indicates that Burger King received anything of value in exchange for entering this agreement. However, McLamore testified that if the fourth and fifth Restaurants would be built nearly in compliance with the development rate for the fifth year he would overlook the year or so default in the fourth Restaurant. (N.T. 39). This attitude seems to be consistent with his overall view toward the development rate with respect to which, he testified, was "designed to insure the company of an orderly process of growth which would also enable the company to produce a profit on the sale of its franchises and through the collection of royalties that the restaurants would themselves produce." (N.T. 35).

The fourth Restaurant was opened on July 1, 1968, at 1721 North DeKalb Pike, Norristown, Pennsylvania, and the fifth Restaurant was opened on October 17, 1968, at 1035 Bustleton Pike in Feasterville, Pennsylvania.

On April 18, 1969, Ferris forwarded a letter to McLamore pertaining to certain delays in site approval and relating McLamore's earlier statement that there would be no problem in waiving the development schedule for the sixth Restaurant. (Plaintiff's Exhibit P–5). The letter expressed Ferris' concern regarding compliance with the development rate. By letter dated April 26, 1969, from Howard Walker of Burger King, Ferris was granted a month extension in the development rate. (Plaintiff's Exhibit P–6). With respect to this extension McLamore testified that "it never crossed my mind to call a default of this agreement on a technicality." (N.T. 47).

On October 1, 1969, the sixth Restaurant was opened at 1515 East High Street in Pottstown, Pennsylvania. The seventh Restaurant was opened on February 2, 1970, ahead of schedule, at 560 North Main Street in Doylestown, Pennsylvania.

At this point in time Burger King was no longer a modest sized franchise system. It had became a wholly owned subsidiary of the Pillsbury Company and had, in fact, evolved into a complex corporate entity. McLamore was elevated to Chairman of the Board of Burger King and, while he remained the chief executive officer for a time, Arthur A. Rosewall was installed as Burger King's President. Ferris was no longer able to expect the close, one to one relationship with McLamore that had previously obtained in his dealings with the company. It seems clear that as a result Family Dining began to experience difficulties in its day to day operations with Burger King.

One of the problem areas which arose concerned site selection. In a typical situation when a franchisee would seek approval for a building site an application would be submitted to the National Development Committee comprised of various Burger King officials. Based on Ferris' prior showing regarding site selection it could be expected that he would have little difficulty in obtaining their approval. In McLamore's view, Ferris was an exceptionally fine franchisee whose ability to choose real estate locations was exceptional. (N.T. 61). However, in August, 1970, a Frankford Avenue location selected by Ferris was rejected by the National Development Committee. The

reasons offered in support of the decision to reject are not entirely clear and it seems that for the most part it was an exercise of discretion. The only plausible reason, given Ferris' expertise, was that the site was 2.7 miles from another Burger King franchise operated by Pete Miller outside Family Dining's exclusive territory. Yet Burger King chose not to exercise its discretion in similar circumstances when it permitted another franchisee to build a Restaurant in Devon, Pennsylvania, approximately 3 miles away from an existing Family Dining Restaurant.

In his August 25, 1970, memo to the Carl Ferris file McLamore observed that Burger King "had sloppy real estate work involved in servicing him and that [Burger King was] guilty of many follow up delinquencies." (Defendant's Exhibit D-7). This was during a time, as Burger King management was well aware, where it was one thing to select a location and quite another to actually develop it. That is, local governing bodies were taking a much stricter view toward allowing this type of development. It was also during this time, as McLamore's memo points out, Burger King realized that the Bucks-Montgomery territory was capable of sustaining substantially more Restaurants than originally thought.

Amidst these circumstances, the eighth Restaurant was opened ahead of schedule on October 7, 1970, at 601 South Broad Street in Lansdale, Pennsylvania. And in December, 1971, Burger King approved Family Dining's proposed sites for two additional Restaurants in Ambler, Pennsylvania and Levittown, Pennsylvania.

In early 1972, Arthur Rosewell became the chief executive officer of Burger King. At this time it also became apparent that the ninth Restaurant would not be opened or under construction by May 10, 1972. On April 27, 1972, in a telephone conversation with McLamore, Ferris once again expressed his concern to Burger King regarding compliance with the development rate. Burger King's position at that time is evidenced by McLamore's Memo to the Carl Ferris file dated April 28, 1972, wherein he

provides that "Ferris' territorial arrangement with the company is such that he must have his ninth store (he has eight open now) under construction next month. I indicated to him that, due to the fact that he was in the process of developing four sites at this time, the company would consider he had met, substantially, the requirements of exclusivity." (Plaintiff's Exhibit P-7). McLamore testified that at that time he had in mind a further delay of 3 to 6 months. (N.T. 55).

In April, 1973, Burger King approved Family Dining's proposed site for a Restaurant in Warminster, Pennsylvania. However, as of May 10, 1973, neither the ninth or the tenth Restaurant had been opened or under active construction.

A letter dated May 23, 1973, from Helen D. Donaldson, Franchise Documents Administrator for Burger King, was sent to Ferris. (Plaintiff's Exhibit P-10). The letter provides as follows:

Dear Mr. Ferris:

During a periodic review of all territorial agreements we note that as of this date your development schedule requiring ten restaurants to be open or under construction by May 10, 1973, has not been met. Our records reflect eight stores open in Bucks and/or Montgomery County, and one site approved but not manned.

Under the terms of your territorial agreement failure to have the required number of stores in operation or under active construction constitutes a default of your agreement.

If there are extenuating circumstances about which this office is not aware, we would appreciate your earliest advice.

It is doubtful that the Donaldson letter was intended to communicate to Ferris that the Territorial Agreement was terminated. The testimony of both Rosewall (N.T. 187) and Leslie W. Paszat (N.T. 256), an executive of Burger King, who worked closely with Rosewall on the Family Dining matter indicates that even Burger King had not settled its position at this time. Ferris' letter dated July 27, 1973, to Rosewall (De-

fendant's Exhibit D–10), and Rosewall's reply dated August 3, 1973 (Plaintiff's Exhibit P–11) also fail to demonstrate any understanding that the Territorial Agreement was terminated.

It seems that throughout this period Burger King treated the matter as something of a "hot potato" subjecting Ferris to contact with several different Burger King officials. Much of Ferris' contact with Rosewall was interrupted by Rosewall's month long vacation and a meat shortage crisis to which he had to devote a substantial amount of his time. Ultimately Paszat was given responsibility for Family Dining and it appears that he provided Ferris with the first clear indication that Burger King considered the Territorial Agreement terminated in his letter of November 6, 1973 (Plaintiff's Exhibit P–14). Burger King's corporate structure had become so complex that the question of who, when or where the decision was made could not be answered. The abrupt manner in which Burger King's position was communicated to Family Dining, under the circumstances, was not straightforward.

From November, 1973, until some point early in 1975, the parties attempted to negotiate their differences with no success. The reason for the lack of success is understandable given that Burger King from the outset considered exclusivity a non-negotiable item. It was during this period on September 7, 1974, that Family Dining began actual construction of the ninth Restaurant in Warminster, Pennsylvania.

Several months before the instant litigation was begun Family Dining informed Burger King that it intended to open a ninth Restaurant on or about May 15, 1975, on Street Road, Warminster, Pennsylvania. In February, 1975, Burger King notified Family Dining that a franchise agreement (license) had to be entered for the additional Restaurant without which Family Dining would be infringing Burger King's trademarks. A similar notice was given in April, 1975, in which Burger King indicated it would retain counsel to protect its rights. Nevertheless Family Dining proceeded with its plans to open the Warminster Restaurant.

In May, 1975, Burger King filed a complaint, which was the inception of this lawsuit, seeking to enjoin the use of Burger King trademarks by Family Dining at the Warminster Restaurant. The Court granted a Temporary Restraining Order until a hearing on the complaint could be held. On May 13, 1975, the parties reached an agreement on terms under which the Burger King trademarks could be used at the Warminster Restaurant. Pursuant to the agreement Burger King filed an amended complaint seeking the instant declaratory relief. Subsequently and also pursuant to this agreement Family Dining opened its tenth Restaurant in Willow Grove, Pennsylvania, the construction of which began on March 28, 1975.

## DISCUSSION

Family Dining raises several arguments in support of its motion pursuant to Rule 41(b).[2] One of its principal arguments is that the termination provision should be found inoperative because otherwise it would result in a forfeiture to Family Dining. For reasons which have become evident during the presentation of Burger King's case the Court finds Family Dining's position compelling both on legal and equitable grounds and is thus persuaded that the Territorial Agreement should not be declared terminated. Under Rule 41(b) when a plaintiff in an action tried by the Court without a jury has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law plaintiff has shown no right to relief. Inasmuch as ter-

2. It is apparent that if this case were to proceed to the presentation of Family Dining's evidence, Family Dining would attempt to establish that the 1968 Modification modified the development rate and/or that there was an effective waiver of said rate. The Court reaches no conclusion on these grounds.

mination is the only relief sought by Burger King, it follows that dismissal of the action is appropriate.

In bringing this suit Burger King maintains that the Territorial Agreement is a divisible contract wherein Family Dining promised to open or have under active construction one new Restaurant in each of the first ten years of the contract in exchange for which Burger King promised to grant one additional year of exclusivity for each new Restaurant. This, to be followed by an additional eighty years of exclusivity provided the first ten Restaurants were built on time. In support Burger King relies on the opening language of Article I of the Territorial Agreement which provides that "[f]or a period of one year, beginning on the date hereof, Company will not operate or license . . ." It is thus argued that since Family Dining clearly failed to perform its promises the Court must, in accordance with the express language of Article II, declare the contract terminated. Burger King further argues that because Family Dining did not earn exclusivity beyond the ninth year, upon termination, it could not be found that Family Dining would forfeit anything in which it had an interest.

■ Contrary to the analysis offered by Burger King, the Court considers the development rate a condition subsequent, not a promise, which operates to divest Family Dining of exclusivity. Where words in a contract raise no duty in and of themselves but rather modify or limit the promisees' right to enforce the promise such words are considered to be a condition. Whether words constitute a condition or a promise is a matter of the intention of the parties to be ascertained from a reasonable construction of the language used, considered in light of the surrounding circumstances. *Feinberg v. Automobile Banking Corporation*, 353 F.Supp. 508, 512 (E.D.Pa. 1973); Williston, Contracts, §§ 665, 666.[3] It seems clear that the true purpose of the Territorial Agreement was to create a long-term promise of exclusivity to act as an inducement to Family Dining to develop Bucks and Montgomery Counties within a certain time frame. A careful reading of the agreement indicates that it raises no duties, as such, in Family Dining. Both Article I and Article II contain language which refers to ninety years of exclusivity subject to limitation. For instance, Article I provides in part that "[t]his Agreement shall remain in effect and licensee shall retain the exclusive territory for a period of ninety (90) years from the date hereof, provided that at the end of one, two . . ." Failure to comply with the development rate operates to defeat liability on Burger King's promise of exclusivity. Liability, or at least Family Dining's right to enforce the promise, arose upon entering the contract. The fact that Burger King seeks affirmative relief premised on the development rate and the fact that it calls for a specified performance by Family Dining tend to obscure its true nature. Nevertheless, in the Court's view it is a condition subsequent. 8 P.L.E. Contracts § 264 (1971).

■ Furthermore, the fact that performance is to occur in installments does not necessarily mean that the contract is divisible. Once again, this is a question of the intention of the parties ascertained, if possible, from a reasonable interpretation of the language used. *Continental Supermarket Food Service, Inc. v. Soboski*, 210 Pa.Super. 304, 232 A.2d 216, 217 (1967). In view of the fact that there was a single promise of exclusivity to have a ninety year duration, assuming the condition subsequent did not occur by a failure to comply with the development rate, the Court believes, consistent with the views previously expressed herein, that the contract was intended to be entire rather than severable.

■ The question arises whether Burger King has precluded itself from asserting Family Dining's untimeliness on the basis that Burger King did not demand literal

---

3. The parties have stipulated that Pennsylvania law applies. *See:* Document No. 29 in Civil No. 75–1290 (E.D.Pa. filed January 7, 1977).

adherence to the development rate throughout most of the first ten years of the contract. Nothing is commoner in contracts than for a promisor to protect himself by making his promise conditional. Ordinarily a party would be entitled to have such an agreement strictly enforced, however, before doing so the Court must consider not only the written contract but also the acts and conduct of the parties in carrying out the agreement. As Judge Kraft, in effect, provided in *Dempsey v. Stauffer*, 182 F.Supp. 806, 810 (E.D.Pa.1960), after one party by conduct indicates that literal performance will not be required, he cannot without notice and a reasonable time begin demanding literal performance.

In the early going Burger King did not demand that Family Dining perform in exact compliance with the development schedule. It failed to introduce any evidence indicating that a change in attitude had been communicated to Family Dining. At the time of the Donaldson letter Family Dining's non-compliance with the development rate was no worse than it was with respect to the fourth and fifth Restaurants. The letter itself was sent by a documents administrator rather than a Burger King official and it seems to imply that the Territorial Agreement would not be terminated. Assuming that at some point between May and November, or even at the time of the Donaldson letter, Ferris realized literal performance would be required, the circumstances of this type of development are such that Burger King was unreasonable in declaring a termination such a short time after, if not concurrent with, notice that literal performance would be required.

Considerable time was consumed in negotiations between November, 1973, until shortly before suit although it appears that these efforts were an exercise in futility given Burger King's view on exclusivity. Moreover, it could be expected that Burger King would have sued to enjoin any further progress by Family Dining, during this lengthy period, just as it did when Family Dining attempted to get the ninth Restaurant under way. The upshot being that the hiatus in development from November, 1973, until active construction began on the ninth and tenth Restaurants is not fully chargeable to Family Dining.

■ Based on the foregoing the Court concludes that Burger King is not entitled to have the condition protecting its promise strictly enforced.

■ Moreover and more important, even though a suit for declaratory relief can be characterized as neither legal nor equitable, *United States Fidelity & Guaranty Co. v. Koch*, 102 F.2d 288, 290 (3d Cir. 1939), giving strict effect to the termination provision involves divesting Family Dining of exclusivity, which, in the Court's view, would amount to a forfeiture. As a result the Court will not ignore considerations of fairness and believes that equitable principles, as well, ought to govern the outcome of this suit. *Barraclough v. Atlantic Refining*, 230 Pa.Super. 276, 326 A.2d 477 (1974).

The Restatement, Contracts, § 302 provides:

"A condition may be excused without other reason if its requirement

(a) will involve extreme forfeiture or penalty, and

(b) its existence or occurrence forms no essential part of the exchange for the promisor's performance."

Taking the latter consideration first, it seems clear that throughout the early duration of the contract Burger King was more concerned with a general development of the territory than it was with exact compliance with the terms of the development rate. Burger King offered no evidence that it ever considered literal performance to be critical. In fact, the evidence indicates quite the contrary. Even though McLamore testified that he never contemplated a delay of the duration which occurred with the ninth and tenth Restaurants, he felt a total delay of approximately 19 months with respect to the fourth and fifth Restaurants was nearly in compliance. On the basis of his prior conduct and his testimony considered in its entirety his comments on this point command little weight.

Clearly Burger King's attitude with respect to the development rate changed. Interestingly enough it was sometime after Burger King realized Bucks and Montgomery Counties could support substantially more than ten Restaurants as had been originally thought.[4] It was also at a time after Rosewall replaced McLamore as chief executive officer.

 Burger King maintains that Ferris' conduct indicates that he knew strict compliance with the development rate was required. This is based on the several occasions where Ferris expressed concern over non-compliance. However, during the presentation of Burger King's evidence it was established that Ferris was an individual who was overly meticulous with details which caused him to be, in many respects, ignored by Burger King officials. Given this aspect of his personality and Burger King's attitude toward him very little significance can be attached to Ferris' expressions of concern. In short, the evidence fails to establish that either Burger King or Family Dining considered the development rate critical. If it eventually did become critical it was not until very late in the first ten years and in such a way that, in conscience, it cannot be used to the detriment of Family Dining.

As previously indicated, the Court believes that if the right of exclusivity were to be extinguished by termination it would constitute a forfeiture. In arguing that by termination Family Dining will lose nothing that it earned, Burger King overlooks the risks assumed and the efforts expended by Family Dining, largely without assistance from Burger King, in making the venture successful in the exclusive territory. While it is true that Family Dining realized a return on its investment, certainly part of this return was the prospect of continued exclusivity. Moreover, this is not a situation where Burger King did not receive any benefit from the relationship.

In making the promise of exclusivity Burger King intended to induce Family Dining to develop its Restaurants in the exclusive territory. There is no evidence that the failure to fulfill the time feature of this inducement was the result of any intentional or negligent conduct on the part of Family Dining. And at the present time there are ten Restaurants in operation which was all the inducement was intended to elicit. Assuming all ten were built on time Burger King would have been able to expect some definable level of revenue, a percentage of which it lost due to the delay. Burger King did not, however, attempt to establish the amount of this loss at trial.

In any event if Family Dining were forced to forfeit the right of exclusivity it would lose something of incalculable value based on its investment of time and money developing the area, the significant risks assumed and the fact that there remains some 76 years of exclusivity under the Territorial Agreement. Such a loss would be without any commensurate breach on its

---

**4.** Although the Court of Appeals for the Third Circuit was concerned with a suit instituted by franchisees under § 1 of the Sherman Act, 15 U.S.C. § 1, in *Ungar v. Dunkin' Donuts of America, Inc.*, 531 F.2d 1211, 1223 (3d Cir. 1976), the following language seems relevant here:

"We do not imagine that many persons are, in any meaningful sense, forced to enter into franchise agreements. It may be that some do so because they have been deceived as to terms, or the potential profitability, of the franchise; it may be that others do not understand or appreciate the details of the bargain. More realistically, we would expect to find that an arrangement reasonable at its inception begins to seem burdensome to the franchisee as the business is successfully established. Only from the successful business can the franchisor effectively seek a continuing return on investment; yet as the venture prospers, the franchisee, in time, may come to regard the arrangement as onerous, restricting his profitability. *Viewed this way, it is apparent that the underlying issues are economic as much as legal.* What price may a franchisor properly demand for its "product"? By what means may it properly exact that price? Of course, within the narrow compass of this appeal we have no occasion to address such fundamental issues, or even to consider whether such issues are properly within the ambit of judicial cognizance. *We have rehearsed these issues, not because they control our decision, but because we ought not to be oblivious to the mainsprings of this litigation.* (emphasis added)."

part since the injury caused to Burger King by the delay is relatively modest and within definable limits. Thus, a termination of the Territorial Agreement would result in an extreme forfeiture to Family Dining.

In accordance with the foregoing the Court finds that under the law and based upon the facts adduced in Burger King's case, it is not entitled to a declaration that the Territorial Agreement is terminated. Therefore, Family Dining's Rule 41(b) motion for an involuntary dismissal is granted.