**The AMERICAN ORIGINAL CORPORATION, Plaintiff,**

v.

**LEGEND, INC., and Smooth Saturn, Inc., Defendants.**

**Civ. A. No. 86–309–JLL.**

United States District Court,
D. Delaware.

June 8, 1988.

373

David A. Jenkins of Lassen, Smith, Katzenstein & Furlow, Wilmington, Del., and

James R. Eyler and Richard Kidwell of Miles & Stockbridge, Baltimore, Md., of counsel, for plaintiff.

Allen M. Terrell, Jr. and Nathan B. Ploener of Richards, Layton & Finger, Wilmington, Del., and Richard L. Bazelon of Bazelon, Less & Price, Philadelphia, Pa., of counsel, for defendants.

LATCHUM, Senior District Judge.

Plaintiff, American Original Corporation (the "plaintiff"), initially brought this action on June 11, 1986, in the Superior Court of the State of Delaware in and for Kent County alleging that Legend, Inc. and Smooth Saturn, Inc. (collectively "the defendants"), breached a contract, dated December 4, 1985, by selling surf clams to plaintiff's competitors. (Docket Item ["D.I."] 1.) Defendants forthwith removed the action to this Court on the ground of diversity jurisdiction.[1] (*Id.*) Once in this Court, defendants filed an answer and amended answer in which they denied that they breached the contract and in addition asserted a two count counterclaim. (D.I. 6 & 11.) Count I of the defendants' counterclaim demands compensatory damages as a result of plaintiff's alleged repudiation of the contract. (D.I. 11 at ¶¶ 1–24.) Count II seeks punitive damages on the ground that plaintiff breached the contract with malice and bad faith. (*Id.* at ¶¶ 25–39.)

The claims of both parties are based on the letter agreement (the "Contract") dated December 4, 1985. (D.I. 1, Ex.A.) The Contract has previously been analyzed by the Court in its opinion, *American Original Corporation v. Legend, Inc.*, 652 F.Supp. 962 (D.Del.1986), when it denied plaintiff's motion to dismiss both counts of defendants' counterclaim for failure to state claims upon which relief could be granted.

The case was tried by the Court without a jury from January 25, 1988 through January 28, 1988.[2] After carefully considering the sufficiency, weight and credibility of the testimony of the witnesses, their demeanor on the stand, the documentary evidence admitted at trial, and the post-trial submissions of the parties, the Court enters the following findings of fact and conclusions of law which are embodied in this opinion as permitted by Rule 52(a), Fed.R. Civ.P.

FACTS

A. *The Clamming Industry*

The plaintiff is the largest integrated surf clam company in the United States which catches, shucks, cans and sells surf clams and quahogs. (D.I. 49 at 29, 172.) While plaintiff is a Maryland corporation, its principal place of business is in Seaford, Delaware. The clamming industry is regulated by the Federal Government which sets quotas on the number of surf clams that can be harvested annually. (D.I. 49 at 19, 21.) The Government also restricts the number of hours which vessels can fish for surf clams in the mid-Atlantic region, which is the ocean area stretching from Long Island, N.Y. to South Carolina. (*Id.* at 19–21.) In the New England region at George's Bank and Nantucket Shoals, the Federal Government establishes bushel quotas on surface clams but no time restrictions. (*Id.* at 20, 22.)

In 1976, the Government placed a moratorium on the entry of new vessels into the mid-Atlantic surf clam fleet so that only those vessels then catching surf clams were granted permits to continue to do so. (*Id.* at 19, 22.) Permits, however, are still being issued to clamming vessels fishing the New England waters. (*Id.* at 22.) The New England clam beds, however, are farther from shore, are more scattered, and the water and weather are rougher, than

---

1. No dispute exists as to this Court's jurisdiction based on 28 U.S.C. § 1332 in that the plaintiff is a Maryland corporation with its principal place of business in Delaware, the defendants are New Jersey corporations with their principal places of business in New Jersey and the amount in controversy exceeds $10,000 exclusive of interest and costs. (D.I. 33, ¶ 2.) The case was properly removed to this Court pursuant to 28 U.S.C. § 1446.

2. Post-trial briefing was completed on April 13, 1988. (D.I. 61.)

those in the mid-Atlantic area. (*Id.* at 26; D.I. 50 at 147–48.)

Two species of clams are harvested—surf clams and quahogs. (D.I. 49 at 26–27.) Surf clams are more desirable than quahogs because they are larger, contain more meat, and have a tongue which can be stripped and fried. (*Id.* at 133.) Quahogs are smaller, the meat is darker with a stronger flavor, and are most generally chopped and used for chowders. (*Id.* at 27.) Quahog fishing is effectively unregulated because the Government's high annual quota of 6 million bushels has never been approached, much less exceeded. (*Id.* at 27; D.I. 50 at 14.)

Both species of clams are caught by vessels which lower and drag a dredge or dredges along the ocean bottom that is broken up by high-pressure water pumped through hose nozzle jets thereby permitting the dredges to dig into the sand beds. (*Id.* at 23–24.) Upon filling the dredges they are hoisted to the deck, the crew separates the clams from other foreign matter (usually by hand), and places the clams in steel cages which hold 32 bushels each. (*Id.* at 24.) Upon completion of a fishing trip, the vessel unloads the cages of clams into trucks that transport them to a processing plant. (*Id.* at 104, 105.) At the plant, the meat is removed from the shells, processed and canned. (*Id.* at 104, 105.)

Plaintiff, unlike many of its competitors, operated its own fleet of clamming vessels, all of which possessed mid–Atlantic surf clam permits. (*Id.* at 19.) These vessels not only harvest surf clams and quahogs in the mid–Atlantic area but on occasion make trips to New England to catch surf clams. (D.I. 51 at 10.) In addition, plaintiff also bought surf clams and quahogs from independent clamming vessels. (D.I. 49 at 32–33.)

The defendants are corporations which own and operate the vessels Smooth Saturn and Legend. (D.I. 48 at 36–37.) The principal shareholders of the defendants were John Doody, Charles Worthington, Lee Levine, and Melvin Levine. (*Id.* at 39.) In the spring of 1985, they purchased eight oil supply vessels and decided to refit and convert two of them (the Smooth Saturn and Legend) to be capable of fishing for surf clams and quahogs. (*Id.* at 108–112; D.I. 50 at 82.) The refitting and conversion of the Smooth Saturn and Legend was accomplished under the supervision of Harold Tyndall at a shipyard in Pascagoula, Mississippi, beginning in June 1985. (D.I. 50 at 83.) In converting the two oil supply vessels to clamming vessels, the principals realized it was a speculative venture. (D.I. 48 at 112.) The Legend and Smooth Saturn were larger than most clamming vessels, could fish in harsher weather than most, had a mechanized process for sorting the clams and shoveling the clams into cages, and had a capacity of about 4480 bushels of clams (140 cages). (D.I. 49 at 38; D.I. 50 at 100; D.I. 51 at 105–107.)

## B.  *1985 Clam Market Conditions and The Contract*

Due to biological factors, clams in the early 1980's were frequently either too young to catch or had little meat. (D.I. 49 at 31.) As a result, there was a shortage of clam meat. (*Id.*) This shortage persisted throughout 1985, resulting in a seller's market for clams. (*Id.* at 31–32; D.I. 48 at 39–40.) In the fall of 1985, American Original was actively soliciting independent vessels to augment the clams that their own vessels were catching. (D.I. 49 at 32.) American Original first discussed the possibility of an arrangement concerning defendants' two boats at a meeting with Tyndall and Worthington on August 9, 1985. (*Id.* at 172.) The boats were discussed only briefly, as the purpose of the meeting was to discuss the possibility of American Original constructing a shucking plant in Atlantic City, New Jersey. (*Id.* at 171.)

While defendants and American Original representatives had other casual contacts, the next formal meeting between the parties was early October, 1985. (*Id.* at 175; D.I. 48 at 178.) Doody and possibly Tyndall represented the defendants, and Ann Marvin, Kim Marvin, and American Original's Executive Vice–President, Robert Nicolay, were present for the plaintiffs. (D.I. 49 at 175.) At this meeting the parties

reached a general understanding regarding the sale of clams caught by the Legend and Smooth Saturn to American Original. (*Id.* at 175–76.) The next meeting between the parties was November 22, 1985. (*Id.* at 176; D.I. 48 at 179–80.) Ann Marvin, Kim Marvin, Bob Nicolay, John Doody, Mel Levine and Lee Levine attended the meeting. (D.I. 49 at 41; D.I. 48 at 43.) At this meeting the parties discussed a proposal that American Original would limit its catch in New England to 50,000 bushels and in addition would purchase surf clams caught by the Legend and Smooth Saturn in New England. (D.I. 48 at 44–48; D.I. 49 at 41; Defendant's Exhibit ["DX"] 47.) The parties also discussed a price for the clams. (D.I. 48 at 48–49.)

The parties met again on December 3, 1985, in what was their last meeting before signing the agreement. (*Id.* at 50–51; D.I. 49 at 41–42.) Attending were the same people as the previous meeting, with the addition of Worthington. (D.I. 48 at 51.) A final price was negotiated and plaintiff agreed to pay for packing and shipping. (*Id.* at 51–53, 150–53.) American Original had previously expressed an interest in also buying the clams of the "Steven S," a vessel in which Doody owned one-half interest and the other half was owned by its captain. (*Id.* at 59, 180.) However, Doody informed the plaintiff at the final meeting that the Steven "S" was fishing for another company, and his partner refused to change buyers. (*Id.* at 59, 181.) Doody informed the plaintiff that the defendants' boats would be ready in a few weeks. (*Id.* at 53.) Having converted a number of boats, Ann Marvin indicated that she realized that conversions generally did not adhere to schedule. (*Id.* at 53, 183.)

After the meeting, American Original drafted the Contract. (D.I. 49 at 43.) Ann Marvin signed the Contract and mailed it to defendants. (*Id* at 44.) The defendants added clarifications, in particular a provision discussed at the December 3rd meeting that required plaintiff to supply the Legend and Smooth Saturn with "adequate cages for fishing operations." (PX–8; *Id.* at 44.) The defendants signed the Contract, initialed the clarifications and sent the Contract to the plaintiff under a cover letter dated December 17, 1985. (PX–8) American Original initialed the clarifications and returned the Contract to the defendants on December 31, 1985. (*Id.;* D.I. 49 at 66.)

### C. *1986 Fishing Season*

In the first week of January, American Original decided to send its own vessels to New England to clam. (D.I. 49 at 71.) The plaintiff was concerned about losing one of its more important customers, Stouffer Foods Corporation. (*Id.* at 57.) Plaintiff's vessels left for New England in the beginning of the second week of January. (*Id.* at 47.) The vessels' first landing of a commercially viable load was immediately sent to the plaintiff's shucking plant. (*Id.* at 56.) The clams were processed and then shipped to Stouffers on February 17th. (*Id.* at 77–78.) However, the shipment was too late and American Original lost its Stouffer account. (*Id.* at 56.) Plaintiff's vessels ultimately caught 22,000 bushels of clams in New England in 1986. (*Id.* at 57.)

The Smooth Saturn left Mississippi in approximately the second week of January and traveled to Cape May, New Jersey, where it spent several days stocking provisions and undergoing stability tests and insurance surveys. (D.I. 50 at 91.) The vessel then proceeded to Ocean City where it arrived on January 29, 1986. (*Id.* at 92; D.I. 49 at 49, 79; D.I. 48 at 184–85.) Under the Contract, both of the defendants' vessels were permitted to make trial runs catching quahogs in the mid-Atlantic region before proceeding to New England. (PX–8) Upon the Smooth Saturn arriving in New Jersey, Kim Marvin informed Harold Tyndall that American Original wanted the Smooth Saturn to stay in the mid-Atlantic and fish for quahogs. (D.I. 49 at 49–50; D.I. 50 at 92.) Marvin offered a price of $2.75, in contrast to the market price for quahogs of $3.00. (D.I. 49 at 49–50; D.I. 50 at 92.) The Smooth Saturn fished quahogs out of Ocean City for two to three weeks, however the vessel was only able to make 4 trips. (D.I. 50 at 97–98.) The vessel suffered some delay because of a

winch failure, but its main problem was American Original's refusal to supply an adequate number of cages for quahog fishing. (D.I. 50 at 94–98; D.I. 48 at 186.) Though the sea trials were not fully completed, the defendants decided it was time to proceed to New England to fish for surf clams, which were a much more profitable catch for the vessel. (D.I. 48 at 147–48; D.I. 49 at 93, 99–100.) On or about February 18, 1986, the Smooth Saturn left for New England, stopping first in Cape May to obtain provisions. (D.I. 50 at 50, 101–104, 153.)

Tyndall contacted Kim Marvin the day after the Smooth Saturn left from Ocean City to inform him of defendant's plans. (D.I. 50 at 200.) At the time the Smooth Saturn had 68 of American Original's cages on board. (D.I. 50 at 102.) As noted above, the capacity of the vessel was 140 to 150 cages. (Id. at 107; D.I. 48 at 187.) Marvin declined to give the vessel any additional cages and indicated that American Original was not interested in New England surf clams from the Saturn. (D.I. 50 at 102.) Doody called Kim Marvin in the following week and received the same response as Tyndall. (D.I. 48 at 187–89; DX–11.)

The defendants' other vessel, the Legend, started up from Mississippi to New Jersey in the latter part of February. (D.I. 50 at 34–35, 107.) After several days in transit and a few days to stock provisions and undergo insurance surveys, the Legend arrived in New Jersey and defendants called the plaintiffs to inform them that the Legend was ready to fish for New England surf clams. (Id. at 108.) American Original was not interested in New England surf clams but offered to buy mid-Atlantic quahogs. (Id.) Defendant declined the offer, and after some repairs, proceeded to New England. (Id. at 108–110.)

Defendants made repeated efforts to contact other processors to secure orders for surf clams or get other work for their vessels. (Id. at 111–12; D.I. 48 at 196–97.) American Original referred a Canadian company to the defendants in late January or February, 1986. (D.I. 48 at 59–60, 189–90; PX–22.) Defendants contacted Sea Watch, another large processor, on about the day that the Smooth Saturn left for New England. (D.I. 50 at 4–5, 49–50.) When it became clear that American Original would not supply the defendants with sufficient cages, Sea Watch on occasion provided cages. (Id. at 103–04, 109.) Generally, however, the defendants received only small orders; the Legend, for instance, never received an order sufficiently large to allow it to operate at full capacity. (Id. at 111.)

The defendants' problems securing orders for surf clams were largely due to changing market conditions in the clam industry. The average yield of clam meat per clam increased by about 30% in 1986. (D.I. 49 at 56.) Clams from Long Island became available in January, 1986, at less than half the prevailing price for mid-Atlantic surf clams. (Id.) American Original bought large quantities of Long Island clams; for instance in March, 1986, Long Island clams were the plaintiff's largest outside source of clams. (Id. at 89.) As a result, in 1986 the clam market changed from a seller's market to a buyer's market. (Id. at 128–29.)

The parties remained in communication, although plaintiff continued to refuse to purchase any surf clams. (D.I. 48 at 197; D.I. 49 at 116.) On April 25, 1986, American Original sent defendants a letter that praised the defendants' vessels and noted that "[h]ad the New York clam resource not made our plans economically impossible, I am sure that your vessels would have had the capacity to do the job on the [George's] Banks [in New England]." (PX–20) The letter also requested that defendants sign a release declaring that the December 4, 1985 Contract would be viewed by both parties as not binding. (PX–20; D.I. 49 at 110–11.) The defendants did not sign the release. Instead, they called the plaintiff and proposed a settlement whereby the plaintiff would: (1) give defendants one of their mid-Atlantic surf clam licenses, (2) promise to buy 4500 bushels of mid-Atlantic surf clams per vessel per week, and (3) halt further fishing in New England. (D.I. 48 at 81–85.) Defend-

ants indicated that they would not sue the plaintiff if the proposal were accepted. (*Id.* at 85.) Kim Marvin subsequently met with the defendants, but ultimately American Original did not accept defendants' proposal, nor did it offer an alternative. (*Id.* at 87–91.) American Original filed the present cause of action in June, 1986. (D.I. 1.)

## ANALYSIS

### A. *Validity of the Contract*

This Court has previously concluded that the December 4, 1985 Contract between the parties constituted a valid output contract for the sale and purchase of surf clams. *American Original Corp.*, 652 F.Supp. at 966. The relevant provision of the agreement states: "the principals of the Legend and Saturn vessels hereby agree to sell to American Original all surf clams caught by said vessels in New England—(George's Banks or Nantucket Shoals)." (D.I. 1 at Ex. A.) The Court declines the plaintiff's invitation to reconsider its ruling that the agreement is a valid output contract in light of the evidence presented at trial. Under 6 *Del.C.* § 2–202, a final written agreement between parties may not be contradicted by evidence of prior or contemporaneous oral agreements. *Gluckman v. Holzman*, 29 Del.Ch. 458, 51 A.2d 487, 488 (1947). The Court concludes that under the contract, the defendants were obligated to sell their entire output of New England surf clams to the plaintiff, and plaintiff was obligated to buy defendants' entire output of New England surf clams.

A separate provision of the agreement states that "American Original agrees to purchase a maximum of 1000 cages of quahogs from the Legend and Saturn vessels during their shakedown period." (D.I. 1 at Ex. A.) In its previous opinion, the Court concluded that this provision was ambiguous. *American Original Corp.*, 652 F.Supp. at 966–67. Having considered the relevant testimony, the Court finds that this provision required the plaintiff to purchase all of the quahogs caught by the defendants' two vessels during their shakedown period, up to a maximum of 1000 cages total, and this part of the agreement was performed. (D.I. 49 at 67–70.)

### B. *Performance*

Plaintiff asserts that the defendants were obligated to shakedown their vessels and then have their boats catching surf clams in New England in January, 1986. (D.I. 58 at 13, 14.) Plaintiff argues that this obligation was either a condition precedent to the agreement or a material provision of the agreement. (*Id.* at 14.) American Original argues that the Smooth Saturn's arrival in Ocean City on January 29, 1986, without having yet performed any shakedown trips, constituted either a non-performance of a condition precedent or a breach of the agreement. (*Id.* at 13–14.)

Whether a term is a condition precedent is determined by the intention of the parties, as shown by the language of the agreement and the circumstances surrounding its performance. *Burger King Corp. v. Family Dining Inc.*, 426 F.Supp. 485, 492 (E.D.Pa.), *aff'd mem.*, 566 F.2d 1168 (3d Cir.1977); 5 S. Williston, *A Treatise on the Law of Contracts*, § 663 (3d ed. 1961). The Contract contains no provision stating that defendants' vessels must be in New England by a certain date.[3] (D.I. 1 at Ex. A.) The only mention of the timing of defendants' performance is the provision stating that the plaintiff will purchase 1000 cages of quahogs from defendants "during their shakedown period and prior to going to New England in early 1986." (*Id.*) It was the plaintiff who drafted the Contract. (D.I. 49 at 180.) If, as plaintiff asserts, the timing of defendants' arrival in New England was "of critical importance" (D.I. 58 at 12–13), the Court is at a loss to understand why the plaintiff neglected to insert a provision in the Contract setting forth a precise time frame for defendants' per-

---

**3.** While the plaintiff's management testified that they told defendants of their pressing need for clams (D.I. 49 at 40), all four of defendants' owners testified that they were never told that the plaintiff was in danger of losing a customer. (D.I. 48 at 57, 159, 164–65, 183.)

formance. Both Ann and Kim Marvin testified that they felt the agreement encompassed all the important points negotiated by the parties. (D.I. 49 at 64; D.I. 51 at 61.) The parties did discuss at negotiations the expected date that the vessels would be ready. The defendants informed the plaintiff that the boats were behind schedule, and estimated that the boats would be ready in late December. (D.I. 48 at 53, 183.) Ann Marvin indicated that she understood that it was very difficult to determine when a conversion of a boat would be completed. (*Id.*) When the plaintiff's management initialed the final changes in the Contract and sent it back to the defendants on December 31, 1985, it was aware that the boats had not yet arrived in the mid-Atlantic area. (D.I. 49 at 67.)

The circumstances surrounding the performance of the Contract also indicate that the plaintiff did not regard the arrival date of the defendants' vessels as either a condition precedent or a term of the Contract. Defendants testified that the plaintiff did not at any time in January, 1986 tell the defendants that the plaintiff considered the delay in arrival of defendants' vessels a failure of a condition precedent or a breach of a provision of the Contract. (D.I. 48 at 63, 184.) While Ann Marvin testified that she talked with Tyndall, defendants' employee in charge of the conversion, defendants testified that Marvin never called any of the owners in January, 1986, to tell them there was a problem. (*Id.;* D.I. 51 at 70–71.) Kim Marvin's letter to the defendants requesting a release from the agreement said nothing about defendants' alleged lateness, but stated instead that the availability of cheap clams from New York was the reason that American Original wanted to be freed from its obligations. (PX–20) The Court finds based on this evidence that it was not the intent of the parties to make the arrival of defendants' vessels in early January either a condition precedent or a material provision of the Contract. Accordingly, the arrival of the Smooth Saturn in Ocean City on January 29, 1986, and the Legend's arrival in late February or early March was not a failure to perform a condition precedent or a breach of the Contract.

■ In its counterclaim, defendants argue that the plaintiff breached the agreement in two respects: (1) it failed to supply the defendants with adequate cages, and (2) it refused to purchase New England surf clams from the defendants. (D.I. 59 at 24–32; D.I. 48 at 29–31.) There is some dispute between the parties as to the meaning of the agreement's provision requiring plaintiff to "supply adequate cages for fishing operations." (D.I. 1 at Ex. A.) Ann Marvin testified that she interpreted "adequate cages" to mean cages constructed properly. (D.I. 51 at 67–68.) Defendants testified that they interpreted "adequate cages" to mean a sufficient number of cages to enable the vessels to fish at full capacity, and that at negotiations the plaintiff's representatives gave indications that they understood that American Original would have to supply a sufficient number of cages. (D.I. 48 at 54, 151–52; D.I. 50 at 28, 94–98.) The Court finds defendants' testimony to be credible on this point, and therefore concludes that the plaintiff was obligated to supply a sufficient number of cages for defendants' fishing needs.

The evidence is clear that plaintiff failed to supply the number of cages defendants needed to fish at full capacity. The Smooth Saturn had continual problems obtaining cages during its shakedown trips. (D.I. 50 at 94–98.) When the vessel left for New England, plaintiff refused to supply more than the 68 cages already on the boat (less than half the vessel's capacity for cages). (*Id.* at 101–102, 188.) The 68 cages were to be used on the Smooth Saturn's first trip and then sent back to the plaintiff, leaving the vessel without any American Original cages for subsequent trips. (*Id.*) The Legend received no cages from the plaintiff at all. (D.I. 50 at 108.) The Court concludes that the plaintiff breached the agreement by failing to provide the defendants with adequate cages for their fishing operations.

■ American Original also breached the agreement by refusing to purchase all of the surf clams caught in New England by the Smooth Saturn and the Legend. The

only surf clams that plaintiff purchased from defendants were the 68 cages from the Smooth Saturn's first trip in New England.

Plaintiff seeks to justify its breach by arguing that defendants' alleged failure to perform relieved plaintiff of its obligations under the Contract. (D.I. 58 at 13.) However, as the Court concluded above, defendants' alleged late arrival in Ocean City was not a failure to perform under the Contract. Defendants' negotiations with two other claim processors, Mother Snows and Sea Watch, also do not indicate a failure to perform under the Contract. Kim Marvin testified that he told Harold Tyndall on January 29, 1986, when the Smooth Saturn arrived at Ocean City, that it was very unlikely that American Original would buy any of defendants' surf clams. (D.I. 49 at 103–105.) In addition, from the outset American Original failed to supply the number of cages promised under the Contract. One of the processors with whom defendants negotiated, Mother Snows, was referred to the defendants by the plaintiff. (D.I. 31 at 98.) Under these circumstances, the Court finds that it was reasonable for defendants to conclude that plaintiff did not intend to perform its obligations under the Contract. Consequently, defendants' dealings with other processors did not constitute a non-performance of its obligations under the agreement, and therefore did not justify the plaintiff's breach. Accordingly, the Court finds for defendants on Count I of their counterclaim demanding compensatory damages as a result of plaintiff's repudiation of the Contract.

### C. *Punitive Damages*

In Count II of defendants' counterclaim, defendants seek punitive damages on the ground that the plaintiff breached the contract with malice and bad faith. Defendants argue that punitive damages are warranted because the plaintiff's breach was wilful and malicious and because plaintiff intentionally and tortiously interfered with defendants' prospective contractual relations. (D.I. 59 at 33.) Defendants charge that American Original entered into the Contract with defendants because plaintiff was trying to exclude its competitors by tying up independent clamming boats. (*Id.* at 34.) Defendants also assert that plaintiff was trying to gain control of the market price. (*Id.*) Defendants argue that plaintiff never intended to honor its commitments to independent clam vessels. (*Id.* at 35.) American Original knew in December, 1985, defendant argues, that it would be able to purchase cheap Long Island clams, and consequently plaintiff would not need defendants' clams nor have the cash flow to pay for defendants' clams. (*Id.* at 35–37.) Defendants charge that plaintiff's bad faith was further exemplified by plaintiff's attempt to induce defendants to fish for quahogs in the mid-Atlantic at a price below market, deliberately undercutting other independent vessels fishing quahogs for plaintiff. (*Id.* at 39–40.) Defendants also point to testimony from Charles McCullough, another independent clammer, who alleged that American Original also breached a contract to buy clams from him. (D.I. 50 at 64–66.)

As a general rule in Delaware, punitive damages are not available in an action for breach of contract. *Reiver v. Murdoch & Walsh, P.A.*, 625 F.Supp. 998, 1014 (D.Del. 1985). However, punitive damages may be granted in egregious cases where the breach of contract is wilful and malicious. *Id.; Casson v. Nationwide Insurance Co.*, 455 A.2d 361,368 (Del.Super.1982). For a party's breach of contract to be considered wilful or wanton, such conduct must be "malicious[ ] and without probable cause, for the purpose of injuring [the other party] by depriving him of the benefits of the [contract]." *Reiver*, 625 F.Supp. at 1015 (quoting *Oliver B. Cannon and Son, Inc. v. Fidelity and Casualty Co.*, 484 F.Supp. 1375, 1388 (D.Del.1980)).

While the plaintiff's simultaneous negotiations with the suppliers of Long Island clams and the defendants may raise doubts as to plaintiff's motives (particularly given plaintiff's financial problems (D.I. 51 at 86)), the Court finds that there is insufficient evidence to indicate that plaintiff acted maliciously and with an intent to injure the defendants. As noted above,

there was a shortage of clams in late 1985, as there had been for several years. (D.I. 49 at 32.) All of the processors apparently were scrambling in late 1985 to arrange to purchase as many clams as possible. While the plaintiff's repudiation of the Contract was certainly in part due to its purchase of cheaper Long Island clams, it would also appear that the change in market conditions also influenced the plaintiff's decision. Plaintiff's need for defendants' clams was further reduced by Stouffer's cancellation of its account with American Original. Under these circumstances, this Court cannot conclude that American Original maliciously breached the Contract with the purpose of injuring the defendants.

■ For much of the same reasons, the Court must reject defendants' claim of intentional tortious interference with prospective contractual relations. As noted by the Court in its previous decision in this case, in an action for tortious interference the interference must be intentional and improper. *American Original,* 652 F.Supp. at 970; *see also* Restatement (Second) of Torts § 766B. The impropriety of the interference is determined by factors such as the actor's motives and the nature of his conduct. Restatement (Second) of Torts § 767. Defendants seek to show plaintiff's allegedly illicit motives by pointing to testimony indicating that American Original was seeking to increase its market share and was hoping to maintain a high price for clams. (D.I. 59 at 34.) However, there is nothing improper about attempting to increase a company's market share or being desirous of a favorable market price. There is little evidence that plaintiff made fraudulent misrepresentations or threats, or engaged in other types of improper actions as discussed in the Comment to the Restatement (Second) of Torts § 767. The evidence that plaintiff entered the Contract with illicit motives is largely conjectural. Consequently, the Court rejects defendants' argument that plaintiff intentionally and tortiously interfered with prospective contractual relations. In sum, the Court concludes that defendants are not entitled to punitive damages and find that plaintiff

is not liable under Count II of defendants' counterclaim.

### D. *Damages*

■ There appears to be no dispute between the parties that the proper measure of damages in this case for breach of contract is the loss of profits. (D.I. 58 at 21–25; D.I. 60; D.I. 61 at 26.) This conforms with the general rule under contract law. *United States v. Behan,* 110 U.S. 338, 344, 4 S.Ct. 81, 83, 28 L.Ed. 168 (1884); *Gardner v. The Calvert,* 253 F.2d 395, 397 (3d Cir.1958), *cert. denied,* 356 U.S. 960, 78 S.Ct. 997, 2 L.Ed.2d 1067; *Smith v. Onyx Oil & Chemical,* 218 F.2d 104, 111 (3d Cir.1955). Defendants retained an accountant who estimated defendants' lost profits to be $1,169,098. (D.I. 59 at 43.) Defendants arrived at this figure by projecting what their revenues and expenses for 1986 would have been had the plaintiff adhered to its agreement, and then subtracting the projected expenses from projected revenues to find projected net income. (DX–39) The difference between projected net income and actual net income was computed at $1,133,299. (D.I. 59 at 43.) To this figure defendants added $35,799 of added interest expense incurred by defendants as a result of their reduced cash flow after plaintiff's breach. (*Id.*)

Plaintiff criticizes defendants' damage calculation on several grounds. Plaintiff first argues that defendants' failed to mitigate their damages by accepting plaintiff's offer to fish for quahogs at below market price. (D.I. 58 at 21.) Plaintiff asserts that if the Smooth Saturn and the Legend had fished quahogs during 1986, the vessels would have earned a total of $687,500. The Court finds this argument incomprehensible, as $687,500 is less than the $704,413 that defendants in fact earned for 1986. (DX–39 at Ex. B.) In addition, defendants undoubtedly would have had higher expenses if they had fished quahogs on a full time basis as opposed to the sporadic fishing for surf clams that defendants actually performed. Even if one were to assume that defendants' vessels had the capacity to catch as many surf clams as it did plus catch $687,500 worth of quahogs,

it is very possible that the increase in revenues of $687,500 would have been equaled or exceeded by the increase in expenses that defendants would have incurred. (D.I. 50 at 101; D.I. 48 at 187–85.)

Plaintiff next criticizes defendants' projected catch rate of 4,500 bushels per trip on George's Bank. Plaintiff notes that in six trips during which the Smooth Saturn was at peak production, it averaged 4,221 bushels. (DX–39 at 7; D.I. 58 at 22.) In addition, American Original argues that defendants overlooked factors that would decrease the catch rate such as harsh weather and mechanical problems. (D.I. 58 at 22.) However, the defendants testified that the average catch for the above mentioned six trips was lowered because on some of the trips the defendants did not have orders for a full load of clams. (D.I. 50 at 177, 207–208.) Defendants' analysis did account for weather and mechanical problems by allowing three days down time per week for each vessel. (*Id.* at 179.) The Court finds that the defendants' estimates adequately take into account quota restrictions and the fishing capacity of other independent vessels. (DX–39 at 8–14.) However, the Court finds that defendants may have overestimated slightly by not adequately considering problems associated with fishing out old clam beds or searching for new clam beds. (D.I. 50 at 147.) Consequently, the Court will reduce the defendants' estimated catch per trip on George's Bank to 4300 bushels for the first, second and fourth quarters and 2900 for the third quarter.[4] This reduces defendants' projected revenue by $89,800.

The Court finds that the defendants' estimated catches for Nantucket Shoals and for mid-Atlantic quahogs to be reasonable.

Plaintiff also objects to defendants' projections for expenses, in particular the figures for fuel, supplies, and maintenance and repairs. (D.I. 58 at 23–24.) Plaintiff argues that the projected costs for these items should be three times the actual costs, because the vessels allegedly sat idle for eight months while under the projections the vessels would have fished twelve months. (*Id.* at 24.)

The Court notes that the Smooth Saturn actually fished for six months in 1986, and had an additional trip in each of two other months. (DX–7) Defendants' projections assumed that the Smooth Saturn would fish in eight months, not twelve. (DX–39 at Exs. E & F.) While the Legend fished less than the Smooth Saturn (D.I. 50 at 111), it also was projected to fish less time, at six and a half months. (DX–30 at Exs. E & F.) The Court also notes that expenses such as supplies and maintenance and repairs may be higher when the boats are first operating and thereafter level off. The Court concludes that tripling defendants' actual 1986 expenses would overestimate the defendants' projected costs. The defendants estimated that their projected fuel costs would be more than double their actual 1986 fuel expense. (DX–39 at Exs. A & B.) The projected figure was based on the actual costs, Harold Tyndall's knowledge of the vessels, his past experience with fuel costs while employed by American Original, and American Original's bud-

---

**4.** Plaintiff also submitted records showing the size of the catches made by the captains of the defendants' two vessels for several months in 1984, when the captains were working for American Original. (PX–51; PX–52.) These records showed an average catch for the captains to be about 1700 bushels and 2100 bushels, respectively. (D.I. 51 at 12.) Defendants objected to the records on several grounds, in particular because defendants were not given sufficient notice that plaintiff intended to submit these records at trial. (D.I. 51 at 100–101.) While the Court has decided to admit the records as evidence, it finds that the records merit very little weight. The records reflect the captains' catches on vessels with a substantially smaller capacity than the defendants' vessels. (*Id.* at 12–13.) The vessels were fishing during the summer months, when clamming vessels have a lower catch rate. (PX–51; PX–52; DX–39 at 9.) It is unclear whether the records include some fishing on Nantucket Shoals, where catch rates are much lower than George's Bank. (PX–51; PX–52.) Plaintiff offered no evidence comparing these captains' performances with other American Original captains in 1984. It is unclear whether other problems may have affected the catch rates, such as mechanical problems, poor weather, inadequate cages, etc. Finally, the failure of plaintiff to follow proper procedure for notifying defendants of its intention to use the documents precluded the defendants from performing adequate cross-examination regarding the records.

geted fuel costs for 1986. (D.I. 50 at 133–36; DX–31.) The Court finds the projected fuel expense to be a reasonable estimate. However, the Court finds the defendants' projection for supplies to be too low. The defendants estimated that supplies would increase by less than a third, from $76,370 to $100,000. (DX–39 at Exs. A & B.) The Court concludes on the basis of the evidence presented that a more reasonable estimate is that supplies would have doubled in cost to $152,740. The defendants estimated that maintenance and repairs would only increase from $79,803 to $92,000. (*Id.*) The Court finds that this increase is also too small; it results in a cost of maintenance and repair per bushel which is roughly 50% of the cost per bushel experienced by American Original. (D.I. 51 at 22.) The Court concludes that the most reasonable estimate is that maintenance and repair expense would also double, from $79,863 to $159,726. Accordingly, the Court will increase defendants' expense projections by $120,466 and decrease their estimate of lost profits by an identical amount.

E. *Interest*

■ Defendants also seek prejudgment and postjudgment interest on the amount of damages resulting from the breach. (D.I. 1 at Ex. A.) In a diversity suit on a contract the law of the forum state, Delaware, regarding prejudgment interest applies when no rate was set by the agreement. *F.E. Myers Co. v. Pipe Maintenance Services, Inc.*, 599 F.Supp. 697, 704 (D.Del.1984). Under Delaware law, prejudgment interest has been granted as a component of the damages in breach of contract cases. *Id.; Rollins Environmental Services v. WSMW Industries*, 426 A.2d 1363, 1364–65 (Del.Super.1980); *Superior Tube Co. v. Delaware Aircraft Industries*, 60 F.Supp. 573, 574 (D.Del.1945). As

profits from the Contract would have flowed to the defendants starting in about March, 1986, and continued through November of 1986 (assuming normal delay by plaintiff in making payments on its debts), the Court will award interest dating from September 1, 1986.[5] The amount of interest awarded by the Court shall be 5% over the Federal Reserve discount rate as of September 1, 1986, to the date that final judgment is entered herein in accordance with 6 *Del.C.* § 2301 (Supp.1986). *F.E. Myers Co.*, 599 F.Supp. at 704. Postjudgment interest shall be awarded by the Court and calculated from the date of entry of the judgment entered herein until paid, at a rate equal to the coupon issue yield equivalent (as determined by the Secretary of Treasury) of the average accepted auction price for the last auction of 52-week United States Treasury bills settled immediately prior to the date of judgment, in accordance with 28 U.S.C. § 1961. *Schumann v. Levi*, 728 F.2d 1141, 1143 (8th Cir.1984); *Miller v. Newsweek, Inc.*, 675 F.Supp. 872, 877 (D.Del.1987).

CONCLUSION

The Court concludes based on the credible evidence that the defendants are entitled to damages in the amount of $958,832 for the plaintiff's breach of the Contract terms regarding the supply of adequate cages and the purchase of defendants' New England surf clams. The Court finds that the plaintiff is also liable for prejudgment interest computed in accordance with 6 *Del. C.* § 2301 from September 1, 1986, to the date of judgment entered herein and for postjudgment interest computed from the date of entry of the judgment herein until paid computed in accordance with 28 U.S.C. § 1961. The Court will deny recovery to the defendants on their counterclaim for punitive damages due to the alleged malicious and the alleged intentional tortious interference with prospective contract and

---

5. Unlike some contracts which contemplate a single payment from buyer to seller, this contract appears to involve a stream of payments over several months. Granting interest to the defendants as of the time of plaintiff's breach in February, 1986, would be a windfall for the defendants because had the contract been performed, defendants would not have received all

the payments from plaintiff in February. Likewise, granting interest as of the end of 1986 would penalize the defendants, as they would most likely have received several payments prior to the end of the year. The Court has chosen September 1, 1986, in an effort to avoid either a substantial windfall to defendants or a substantial penalty.

wanton breach of contract by the plaintiff. The Court will also deny plaintiff's claim against the defendants for breach of contract.

An order will be entered in accordance with this Memorandum Opinion.